[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-10989

_____

D. C. Docket No. 01-08069 CR-WPD

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 8, 2003
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

> Plaintiff-Appellee,
> Cross-Appellant,

versus

LLOYD HASNER,
LISA FISHER,

> Defendants-Appellants,
> Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(August 8, 2003)**

Before EDMONDSON, Chief Judge, DUBINA, Circuit Judge, and HODGES[*],
District Judge.

_____

[*] Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida,
sitting by designation.

PER CURIAM:

Lloyd Hasner and Lisa Fisher Meuche ("Fisher") were convicted, following a jury trial, for (1) conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and (2) mail fraud, in violation of 18 U.S.C. § 1341. Hasner was also convicted of money laundering, in violation of 18 U.S.C. § 1957, and Fisher was convicted for making false statements, in violation of 18 U.S.C. § 1001. Hasner and Fisher appeal, challenging their convictions. Fisher also appeals her sentence. The government cross appeals the district court's imposition of sentence for Hasner and Fisher.

## I. BACKGROUND

The Palm Beach County Housing Finance Authority ("HFA") is a governmental entity chartered under Florida law to fund low-cost housing. Hasner was the chairman of the HFA, the proprietor of Hasner Realty, and an officer in Castle Florida Building Corporation: a construction company owned by his brothers. Lisa Fisher was a sales associate with Main Street Realty and owned Lisa Fisher & Company: a real estate consulting firm.

2

At the September 1996 HFA meeting, Hasner proposed that Fisher be hired as a consultant. The HFA approved the motion to negotiate a contract with Fisher. Richard Ellington, a lawyer who served as the paid legal adviser to the HFA, was directed to prepare a contract. This agreement was presented to the HFA at its October 1996 meeting. The agreement provided for a six-month contract with Fisher at $ 5,000 per month and reimbursement of Fisher's expenses. Due to concerns about the amount of expenses to be paid, final action on the contract was deferred.

In the interim, Fisher was retained by Hawthorne Ltd., a developer of low-income housing projects, to find potential sites in Florida. Fisher contacted Hasner about the availability of potential project sites. On 13 November 1996, Hasner contacted Chris Fleming at Reichel Realty & Investments, Inc. ("Reichel Realty") about a 30-acre tract of land in Greenacres City, Florida. This 30-acre parcel of land would later be named Chelsea Commons. Hasner registered Fisher as the agent for a potential buyer.[1] At Hasner's direction, Fisher contacted Fleming to confirm that she was acting on behalf of Hawthorne.

---

[1] A broker representing a buyer registers his client with the listing agent to preserve his interest in the commission.

On 14 November 1996, Fleming and Fisher reached an oral understanding for the sale of the 30-acre tract to Hawthorne for $1.8 million. That same day, Fleming sent Fisher a letter confirming their agreement on the distribution of the 6% brokers's commission. Under this agreement, Reichel Realty and Main Street Realty, respectively, were to receive 3-1/2% and 2-1/2 % of the commission. It was also agreed that Reichel Realty and Fisher would each pay Hasner a referral fee of $4,500. In addition, Main Street Realty agreed to pay Hasner a referral fee of 1% of the purchase price, or $18,000.

At the 18 November 1996 HFA meeting, it was announced that Hawthorne had secured a potential development site and wished to enter a proposal for the development of a publicly-funded affordable housing development. It was revealed that Fisher had been retained by Hawthorne and would receive a $30,000 contingency fee from Hawthorne upon HFA's final approval of the project.

At the 18 November meeting, the HFA also discussed the issue of Fisher's still-pending consulting contract. An HFA member expressed concern over Fisher's simultaneous employment by Hawthorne and HFA. As a result, a provision was added to Fisher's contract with the HFA which required Fisher to disclose any clients appearing before or submitting materials to the HFA. The HFA -- including Hasner -- unanimously approved Fisher's consulting contract

4

with the HFA. Neither Fisher nor Hasner disclosed that, if the Chelsea Commons sale was completed, Hasner would receive a referral fee. Thereafter, beginning in January 1997 and continuing through June 1997, Fisher received by mail her monthly retainer and expense reimbursements from the HFA.

On 16 December 1996, Hawthorne presented its proposal for Chelsea Commons and sought to have the project financed by HFA's issuance of about $16 million in tax-exempt bonds. At this meeting, Hasner announced that he had a "potential conflict" and recused himself from voting on the matter. Hasner also executed the prescribed form, stating that he had a potential conflict and was abstaining from discussing or voting on the matter. Hasner did not disclose the nature of his conflict to the HFA. The HFA voted to proceed with the development.

In early 1997, Castle Florida, the construction company owned by Hasner's brothers, negotiated a contract with Hawthorne to consult on the Chelsea Commons project. Ellington made an inquiry to the Florida Attorney General and the Florida Ethics Commission about the obligations of an HFA member who obtains a contract for services to be furnished in conjunction with a qualifying housing development. After Ellington was informed that the possession of such an interest violated Fla. Stat. § 159.606, Hasner submitted a letter stating that he

had resigned as an officer of Castle Florida on 10 February 1997 and that Castle Florida's contract with Hawthorne had terminated.

At the 2 June 1997 HFA meeting, before the final vote on the Chelsea Commons project, an HFA member asked to be advised on conflicts involved in the project. Ellington informed the HFA, in the presence of Hasner and Fisher, that Hasner at one point thought that he might be the contractor for Chelsea Commons, but that this event was not going to happen. Ellington stated, however, that Hasner would continue to desist from voting on the Chelsea Commons issue. Ellington also noted that Fisher had disclosed from the beginning that she was the agent for the project. Ellington then stated "[o]ther than that, I don't know of any other disclosures that need to be made." Neither Ellington, Hasner, or Fisher informed the HFA that Hasner was to receive a $27,000 brokerage fee from the Chelsea Commons project.

The Chelsea Commons project involved the separate closings of the real estate and bond transactions. The real estate sale closed first. The initial draft of the closing statement ("HUD-1"), prepared by the buyer's attorney, Gary Johnson, omitted all reference to Hasner's fees. Later, upon receiving the 14 November agreement reflecting Hasner's $9,000 fee from Reichel and Main Street Realty, Johnson revised the HUD-1 to reflect the $9,000 payment to Hasner. The HUD-1

did not reflect the additional $18,000 fee Hasner was to receive from Main Street Realty.

Upon receiving the revised HUD-1, HFA's bond counsel, Steve Sanford, and the developer's attorney, Randy Alligood, concluded that Hasner's receipt of payment was improper. As a condition of the bond issuance, the attorneys were required to warrant that the matter being financed had been conducted in accordance with Florida law, including the conflict of interest provisions of Fla. Stat. § 159.606.[2] Alligood and Sanford informed Ellington that they would withhold their approving opinions if Hasner's payment was not repudiated.

Alligood prepared a letter for Hasner's signature, in which the real estate fee was disclaimed and its inclusion in the closing statement deemed a mistake. Ellington spoke with Hasner and informed him that "to fix the situation" Hasner should sign the letter disclaiming the interest in the $9,000 real estate fee and that Fisher would pay the fee to Hasner out of an unrelated project called Tierra Vista.

---

[2] Florida Statute section 159.606 provides in relevant part:
"No member or employee of a housing finance authority shall acquire any interest, direct or indirect, in any qualifying housing development or in any property included or planned to be included in such a development, nor shall a member or employee have any interest, direct or indirect, in any contract or proposed contract for materials or services to be furnished or used in connection with any qualifying housing development. If any member or employee of a housing finance authority owns or controls an interest, direct or indirect, in any property included or planned to be included in any qualifying housing project, the member or employee shall immediately disclose the same in writing to the housing finance authority."

Ellington stated that it had to "be very understood" among Ellington, Hasner, and Fisher that "nobody else is to know about it."

Hasner then contacted Fisher to obtain her assurance that he would be paid his commission even if he renounced his fees. Fisher attempted to assure Hasner that the owner of Main Street Realty, Judy Black, would not learn of the disavowal letter. Hasner later informed Ellington that he would allow the entire housing project to "crater" if he did not receive a written commitment from Main Street Realty that he would receive his full fee. Fisher called Steve Chitwood, the senior broker involved in Main Street Realty's commercial real estate sales. According to Fisher, Chitwood, after some debate, gave his permission for Hasner to be paid from the Tierra Vista project. Nothing in the closing documents possessed by Main Street Realty reflected that Hasner was to receive a commission from the Tierra Vista project. According to Black, it would have been Chitwood's responsibility to note the changes in the file. Black agreed, however, that the change was absent from the file did not necessarily mean that Chitwood had not agreed to it.

Fisher provided Hasner with a handwritten letter signed by Fisher as an associate of Main Street Realty: a letter stating that Hasner Realty had earned a real estate commission from the Tierra Vista project. Hasner then signed the

8

Chelsea Commons disavowal letter. After receiving Hasner's disavowal letter, the attorneys issued their opinion letters for the bonds. Fisher did not provide Main Street Realty with a copy of the disavowal letter or her handwritten assurance to Hasner that he would be paid his commission on the Tierra Vista project.

The pending sales transaction forms -- used by Main Street Realty to track the money received and expended by the company in real estate transactions -- did not reflect that Hasner was to receive a commission for the Tierra Vista property. The forms did reflect, however, that Hasner was to receive a referral fee for the Chelsea Commons property. As a result, Black wrote Hasner a check for his referral fee from the Chelsea Commons project. Upon Hasner's request, the check was sent to him by Federal Express. Later, after Black learned of the disavowal letter, she sought the return of Hasner's commission.

On 18 February 2000, the FBI interviewed Fisher at her home. Fisher stated that she had not paid Hasner a fee from the Chelsea Commons transaction, had not directed anyone to pay Hasner a fee from the transaction, and had no side agreement to share her brokerage fee with Hasner. On 28 February 2000, Fisher was re-interviewed by an FBI agent and largely repeated her previous statements.

On 8 May 2001, a grand jury returned an indictment against Hasner and Fisher. Count One charged Hasner and Fisher with conspiring to deprive the Palm

Beach County Housing Finance Authority ("HFA") of Hasner's honest services and to acquire money and property through fraudulent misrepresentations, in violation of 18 U.S.C. §§ 1341, 1346.

Count Two charged Hasner and Fisher with mail fraud relating to Hasner's receipt of a check from the Chelsea Commons project, sent via Federal Express, in violation of 18 U.S.C. § 1341. Counts Three through Six charged Hasner and Fisher with additional counts of mail fraud relating to Fisher's consulting contract with HFA.

Count Seven charged Hasner with money laundering, in violation of 18 U.S.C. § 1957, and Count Eight charged Fisher with having made false statements to an investigating agent, in violation of 18 U.S.C. § 1001. The jury convicted Hasner and Fisher of all counts on special verdicts.[3]

At sentencing, Fisher argued that the appropriate guideline to establish her base offense level was U.S.S.G. § 2C1.3, the guideline pertaining to conflicts of interest, rather than U.S.S.G. § 2C1.7, which pertains to fraud involving the

---

[3] The district court granted Hasner and Fisher partial relief from their conspiracy convictions. The district court concluded that insufficient evidence was in the record for a reasonable jury to conclude that Main Street Realty had been defrauded. The district court therefore granted Defendants' motion for a judgment of acquittal on the conspiracy count to the extent that it related to the fraud upon Main Street Realty. The district court, however, did not dismiss Count One, upholding the conviction of the conspiracy charge on the "honest services" facet of the conspiracy. The government does not appeal the district court's partial judgment of acquittal.

deprivation of the intangible right to honest services. Fisher further objected to an obstruction-of-justice enhancement based upon her testimony at trial.

The district court sustained Fisher's challenge to the obstruction-of-justice enhancement. The district court determined that U.S.S.G. § 2C1.3 was the appropriate guideline to establish the base offense level because the gravamen of the misconduct was the concealment of Hasner's financial interest. The district court concluded, however, that an offense level of six, with a sentencing range of 0-6 months "trivialized" the misconduct; and the court imposed a four-level upward departure, resulting in a sentencing range of 6-12 months. The district court imposed a six-month sentence.

In a similar way, at Hasner's sentencing, the district court applied U.S.S.G. § 2C1.3, resulting in a 14-month sentence.

Hasner and Fisher appeal their convictions. Fisher appeals her sentence. The Government cross-appeals Hasner and Fisher's sentences.

## II. DISCUSSION

A. <u>Vagueness</u>

Defendants argue that the "honest services" charges are unconstitutionally vague and fail to set boundaries for prosecutorial discretion. Defendants assert that 18 U.S.C. § 1346, the "honest services amendment" to the mail fraud statute, provides no notice as to what conduct is prohibited. Defendants contend that the district court erred by allowing the government to bring criminal charges based upon previously undefined conduct that had only been vaguely addressed by state civil statutes.

Because Defendants' void-for-vagueness challenge to section 1346 does not raise a First Amendment issue, we review section 1346 only as applied in the instant case. See United States v. Waymer, 55 F.3d 564, 568 (11th Cir. 1995). A statute is unconstitutionally vague if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 103 S.Ct. 1855, 1858 (1983).

The constitutionality of a vague statutory standard is closely related to whether the standard incorporates a mens rea requirement. Waymer, 55 F.3d at 568. "A statutory requirement that an act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes

12

without warning an offense of which the accused was unaware." Id. (internal quotation omitted).

In this case, to convict the Defendants of mail fraud, the government was required to prove specific intent to defraud. 18 U.S.C. §§ 1341, 1346. As we will discuss, Defendants' convictions were not based upon the Florida statutes; and the jury concluded that Defendants specifically intended to deprive the public of Hasner's honest services. See generally Waymer, 55 F.3d at 568. Accordingly, we conclude that section 1346 was not unconstitutionally vague as applied to Defendants.

B.      Sufficiency of the Indictment/Constructive Amendment

Defendants argue that the indictment improperly based the criminal violations on state ethics statutes which have not been similarly applied and have no criminal or civil penalties. Defendants further argue that the district court constructively amended the indictment by not requiring the government to prove a violation of state ethics law.

"A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may

13

have been convicted on a ground not alleged by the indictment." United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002) (quoting United States v. Poarch, 878 F.2d 1355, 1358 (11th Cir. 1989), cert. denied, 123 S.Ct. 913 (2003). Mere surplusage, however, may be deleted from an indictment without error. United States v. Cancelliere, 69 F.3d 1116, 1121 (11th Cir. 1995), as amended on clarification (2 February 1996).

"To establish a violation of sections 1341 and 1346, the Government must prove that the defendants (1) intentionally participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme or artifice." United States v. Lopez-Lukis, 102 F.3d 1164, 1168 (11th Cir. 1997) (internal quotations omitted). Proof of a state law violation is not required for a conviction of honest services fraud. Cf. Langford v. Rite Aid of Alabama, Inc., 231 F.3d 1308, 1312-13 (11th Cir. 2000) (concluding that duty to disclose information for purposes of mail fraud statute can be found even in the absence of a statute or regulation); see also United States v. deVegter, 198 F.3d 1324, 1328 (11th Cir. 1999) (private-sector, honest services fraud).

Although the indictment listed the state ethics statutes which purportedly prohibited Hasner from receiving the Chelsea Commons commission, the indictment did not rely upon violations of these state statutes as a basis for the

14

honest services charges. Instead, the indictment focused on Hasner's unjust enrichment while he served as chairman of the HFA and on the concealment of Hasner's financial relationship with Fisher. Because the inclusion of the state statutes in the indictment was mere "surplusage," the district court's redaction of these statutes did not result in an impermissible broadening of the indictment.[4]

C.     Jurisdiction

Defendants contend that the government failed to demonstrate a sufficient connection to interstate commerce for the mail fraud and conspiracy counts, which are based upon Hasner's receipt of a check through Federal Express. Defendants assert that, because the check involved in these counts was sent by Federal

---

[4] Because we conclude that the inclusion of the state ethics statutes in the indictment was surplusage and that the district court did not constructively amend the indictment, it is unnecessary to address Defendants' arguments that honest services charges could not be premised on the three state ethics statutes. The district court similarly did not err by refusing to instruct the jury on these statutes. Finally, because a showing that Hasner complied with Fla. Stat. § 159.606 was immaterial to the conclusion of whether Hasner intended to deprive the public of his honest services, the district court did not abuse its discretion by refusing to admit expert testimony interpreting Fla. Stat. § 159.606. Although defendants assert that government witnesses (lawyers for the bond deal) testified about Fla. Stat. § 159.606, the record reflects that these witnesses did so in the context of explaining why they refused to certify the bond issuance unless Hasner disavowed his interests in the Chelsea Commons project, including his referral fee.

15

Express and was an intrastate delivery, the government failed to establish jurisdiction.

In 1994, Congress amended the mail fraud statute to include mail sent by "private or commercial interstate carrier[s]." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 250006, 108 Stat. 1796, 2087. At trial, the parties stipulated that Federal Express was an interstate carrier. We conclude that Congress properly exercised its power under the Commerce Clause. U.S. Const. art. I, § 8, cl. 3 by regulating private and commercial carriers as instrumentalities of interstate commerce -- even though the conduct took place entirely intrastate. See United States v. Gil, 297 F.3d 93, 100 (2d Cir. 2002) (concluding that private and commercial interstate carriers, which carry mailings between and among states and countries, are instrumentalities of interstate commerce, notwithstanding the fact that they also deliver mailings intrastate); United States v. Photogrammetric Data Servs., Inc., 259 F.3d 229, 249-52 (4th Cir. 2001), cert. denied, 122 S.Ct. 1295 (2002) (concluding that private and commercial interstate carriers are instrumentalities of interstate commerce, which Congress can regulate and protect from harm, even where the conduct at issue was intrastate). Accordingly, the district court had jurisdiction over the mail fraud charges against Defendants.

D.    Sufficiency of the Evidence

Defendants argue that insufficient evidence supports their honest services convictions. In reviewing a conviction for sufficiency of the evidence, we determine whether "a reasonable jury, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the government could find the defendant[s] guilty as charged beyond a reasonable doubt." United States v. Poirier, 321 F.3d 1024, 1032 (11th Cir. 2003) (internal quotation omitted), petition for cert. filed, (2 July 2003).

1.    The Consulting Contract: Counts 1, 3-6

Defendants assert that the government did not prove a deprivation of "honest services" with respect to Fisher's consulting contract. Defendants contend that the undisputed facts at trial reflect that, before Hasner recommended that the HFA enter into a consulting contract with Fisher, Hasner and Fisher had no conversations about a potential real estate commission from Chelsea Commons. Defendants assert that the only real estate related conversations occurred after the consulting agreement was approved, but before the HFA voted on the $2,500 cap

17

for reimbursement of Fisher's potential expenses under the contract. Defendants further assert that the government presented no evidence that they had the specific intent to deprive the HFA of Hasner's honest services, no evidence that there was a cognizable harm, and no evidence that the mailings were made in furtherance of the scheme to defraud.

Section 1341 proscribes use of the mails as part of a "scheme or artifice to defraud." 18 U.S.C. § 1341 (1994). Section 1346 defines "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services."

"Public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest." deVegter, 198 F.3d at 1328. When a public official, instead, secretly makes decisions based on his own personal interests, the official defrauds the public of his honest services. See Lopez-Lukis, 102 F.3d at 1169. "A defendant's breach of a fiduciary duty may be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information." Waymer, 55 F.3d at 571.

A reasonable jury could conclude that Hasner breached his fiduciary duties by voting on Fisher's consulting contract without disclosing the agreement he had with Fisher to receive a referral fee, if the Chelsea Commons real estate

18

transaction was completed. Hasner proposed Fisher's consulting contract to the HFA in September 1996: before Fisher sought Hasner's help in locating property for the Chelsea Commons project. Fisher's contract, however, was not approved by the HFA in its final form until 18 November 1996: after the Chelsea Commons proposal had been submitted to the HFA and after Fisher and Fleming had agreed to pay Hasner a referral fee if the real estate transaction was completed. Because Hasner, by voting on Fisher's contract, was taking discretionary action that directly benefited Fisher, Hasner's agreement with Fisher to share the commission from the Chelsea Commons project was material.

Furthermore, the evidence at trial, including the wiretaps, indicated that Fisher and Hasner later took steps to conceal Hasner's interest in the Chelsea Commons project. When an HFA member expressed concern about potential conflicts on the Chelsea Commons project, Hasner did not disagree with Ellington's representation -- made in Hasner's presence -- to the HFA that the conflict had to do with Hasner's interest in his brothers' construction company. When Hasner's $9,000 referral fee was included in the HUD-1, Hasner's brother, calling Fisher on Hasner's behalf, commented to Fisher "Lloyd thought everything was going to be quiet." Fisher later acknowledged that the inclusion of the referral fee was "a major, major blunder."

In the light of the evidence and Hasner's failure to disclose the real estate commission he would receive if the property for the Chelsea Commons project was sold, a reasonable jury could conclude that Hasner possessed the requisite intent to deprive the HFA of his honest services by using his discretionary authority to vote in favor of Fisher's consulting contract.

A reasonable jury could also conclude that Fisher possessed the requisite intent to deprive the HFA of Hasner's honest services. Fisher testified that she "had no clue" that Hasner's vote on her consulting contract was subject to disclosure or recusal requirements and that she did not attempt to influence Hasner's vote. But the jury was free to reject this testimony. Based upon the evidence and Fisher's testimony, the jury was free to infer that the opposite of Fisher's testimony was true and conclude that Fisher intended to influence Hasner's honest services. See United States v. Mejia, 82 F.3d 1032, 1038 (11th Cir. 1996) ("A proper inference the jury can make from disbelieved testimony is that the opposite of the testimony is true"); United States v. Brown, 53 F.3d 312, 314-15 (11th Cir. 1995) (defendant's explanations at trial can actually increase amount of evidence supporting guilty verdict).

Although Defendants argue that the government failed to demonstrate a cognizable harm because the consulting contract and Chelsea Commons projects

20

both furthered the public good, the harm was to the public's intangible (but very real) right to honest and impartial government. See Lopez-Lukis, 102 F.3d at 1168.

The government also established the requisite "mailing" to support Defendants' convictions. Although "mailing" is a required element of mail fraud, the use of the mails need not be an essential element of the scheme. See United States v. Paradies, 98 F.3d 1266, 1282 n. 29 (11th Cir. 1996). Here, the fraud in this case did not achieve fruition until Fisher received the checks from the ill-obtained contract. Thus, the government established the required mailing element.

2.    Counts 1 and 2

Defendants argue that, for the Chelsea Commons project, the Government failed to prove that Hasner's "honest services" were corrupted or that Fisher intended to deprive anyone of Hasner's "honest services." Defendants note that Hasner recused himself from voting on any matter relating to Chelsea Commons. Defendants assert that, because Hasner did not engage in any official act for Chelsea Commons, no deprivation of Hasner's honest services resulted. Fisher also asserts that she had no duty to disclose or to clarify any conflict that Hasner

may have had and that no evidence was presented that she intended to deprive the HFA of Hasner's honest services.

A government official may be guilty of honest services fraud if he withholds material information. See Waymer, 55 F.3d at 572. Although Hasner filed conflict of interest forms and refrained from voting on the Chelsea Commons project, the record reflects that Hasner concealed material information (his financial stake) from the HFA.

The conflict of interest forms stated that Hasner had a potential conflict of interest, but provided no details. At the 2 June 1997 meeting, at which HFA members gave their final approval to the Chelsea Commons project, an HFA member specifically asked about conflicts in the project. In Hasner and Fisher's presence, Ellington informed the HFA that Hasner, at one time, had thought that he might be the contractor for the Chelsea Commons project. Ellington informed the HFA that, although Hasner was not going to be the contractor, Hasner was going to continue to refrain from voting on the project. Ellington stated that he did not know of other disclosures that needed to be made. Hasner did not correct Ellington's statement or inform the HFA of the real estate commission agreement between Fisher and him.

22

By failing to disclose the commission that he would receive, Hasner prevented the HFA from making a fully informed decision, and he potentially placed the bond issuance in jeopardy. At the bond closing, the attorneys, who were required to warrant that the Chelsea Commons project was being financed in accordance with Florida law, refused to approve the issuance of the bonds without Hasner disavowing his commission. Although Hasner signed a letter disclaiming the real estate fee and claiming that the inclusion of the disbursement to Hasner Realty in the closing statement was a mistake, Defendants, in reality, ensured that Hasner would receive his fee.

Although it is perhaps true that Fisher had no duty to disclose Hasner's conflict of interest, the jury, in the light of the evidence and Fisher's testimony, was also free to disbelieve Fisher's testimony that the commission on the Chelsea Commons project was not in exchange for Hasner's vote on her consulting contract. See Brown, 53 F.3d at 314-15 (a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt).

Based upon the evidence presented at trial, a reasonable jury could conclude that Hasner and Fisher sought to deprive the HFA of Hasner's honest services.[5]

---

[5] Hasner argues that, because the money laundering count was based upon a flawed, honest services theory, the government's failure to establish an honest services case mandates a judgment of acquittal as to the money laundering charges. Because we uphold the honest services charges, this

23

### 3. Count Eight - False Statement

Fisher argues that the government failed to meet its burden of establishing that her alleged false statement – the indictment focused on Fisher's second interview with the FBI -- to investigators was material. Fisher contends that her pertinent statement could not have influenced the Chelsea Commons investigation because (1) the government admitted no investigative purpose supported the purpose for the interview; (2) her statement repeated the statement that she gave at an earlier interview; and (3) no evidence was presented that her statement was capable of influencing the government's investigation.

"A statement is material if it has a natural tendency to influence or the capability to influence government action." United States v. Johnson, 139 F.3d 1359, 1363 (11th Cir. 1998). The government is not required to show actual reliance on a statement for it to be material; instead, a false statement "must simply have the capacity to impair or pervert the functioning of a government agency." See United States v. Calhoon, 97 F.3d 518, 530 (11th Cir. 1996).

Although Fisher asserts that her pertinent statements cannot be material because they repeated her earlier statements to the FBI, her false statements during

argument is without merit.

24

the second interview were a continued effort to impede the FBI investigation. In addition, although Fisher testified that her statements were not false (because she was unaware that the notation line on Hasner's commission check identified Chelsea Commons), the evidence at trial, including Fisher's own testimony, was sufficient for the jury to conclude that Fisher knew the statements to the FBI were false. Brown, 53 F.3d at 314-15.

E.     Admission of Co-Conspirator's Statements

Defendants argue that the wiretap tapes were inadmissible because no foundation for their admission was established under Fed.R.Evid. 801(d)(2)(E). Defendants contend that the 1997 amendments to Fed.R.Evid. 801(d)(2)(E) invalidated the discretion courts previously had to admit provisionally co-conspirator statements. Defendants also contend that, even at the end of the trial, insufficient evidence existed to admit the tapes.

We review the district court's evidentiary rulings for an abuse of discretion. See United States v. Hands, 184 F.3d 1322, 1326 (11th Cir. 1999) amended by 194 F.3d 1186 (11th Cir. 1999), cert. denied, 123 S.Ct. 712 (2002).

Under Rule 801(d)(2)(E), statements of co-conspirators made during the course and in furtherance of the conspiracy are not hearsay. For evidence to be

admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence these things: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy.  In determining the admissibility of co-conspirator statements, the trial court may consider both the co-conspirator's statements and independent external evidence.  United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002), cert. denied, 123 S.Ct. 707 (2002).

Co-conspirator statements can be provisionally admitted subject to the government "connecting them up" with sufficient evidence.  United States v. Allison, 908 F.2d 1531, 1533-34 (11th Cir. 1990).  Contrary to Defendants' assertions, the 1997 amendment to Fed.R.Evid. 801(d)(2)(E) did not change this situation.  Instead, the stated purpose of the 1997 Amendment was to codify three issues raised by Bourjaily v. United States, 107 S.Ct. 2775 (1987).  See Fed.R.Evid. 801(d)(2)(E) advisory committee's notes.  The advisory committee notes state that the amendment (1) codifies the holding of Bourjaily by expressly requiring that courts consider the contents of the co-conspirator's statement in determining the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered; (2) provides that the

26

contents of the statement do not alone suffice to establish a conspiracy in which the declarant and the defendant participated; and (3) extends the reasoning of Bourjaily to subdivisions (C) and (D) of Rule 801(d)(2). Neither Bourjaily nor the amendment to Fed.R.Evid. 801(d)(2)(E) addresses the issue of whether district courts may provisionally admit co-conspirators' statements. Accordingly, the district court properly admitted the wiretap evidence on a provisional basis.

Furthermore, the government established by a preponderance of the evidence that Fisher and Hasner were involved in a conspiracy. The independent evidence reflected that, when Hasner voted on Fisher's consulting contract at the 18 November 1996 HFA meeting, Hasner and Fisher had reached an agreement for Hasner to receive a referral fee if the sale of the Chelsea Commons property was completed. The independent evidence also reflected that Hasner did not disclose this fee to the HFA when voting on Fisher's consulting contract or when later asked about his Chelsea Commons conflict by the HFA. Because sufficient evidence supports the district court's admission of the wiretap evidence as co-conspirator's statements, the district court did not abuse its discretion by admitting this evidence.

F.     Closing Arguments

27

Defendants argue that the district court erred by denying their motion for a mistrial based upon the prosecutor's improper remarks during closing arguments. Defendants contend that the prosecutor seized upon the emotions of the 11 September 2001 tragedy to inflame the jury.

The purpose of closing arguments is to assist the jury in analyzing the evidence. See United States v. Iglesias, 915 F.2d 1524, 1529 (11th Cir. 1990). "Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused." United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997) (quoting United States v. Lopez, 898 F.2d 1505, 1511 (11th Cir. 1990).

During closing arguments, the prosecutor stated:

> That's not what the United States is all about. That's not what democracy is all about. Democracy is about full honest disclosures in a public forum. Allowing people to debate the merits of an issue knowing all the facts. It's the antithesis of democracy.

Defendants did not object. Defendants did object, however, when the prosecutor thereafter stated:

> Secrets and democracy do not go hand in hand. They are the antithesis of each other.

28

The district court denied Defendants' motion for a mistrial and instructed the jury to disregard the references to democracy. The prosecutor later added these words:

> You are the representatives of the public. You with your verdict will expose this corruption and bring it to light.

Defendants again requested a mistrial. The district court denied the motion and instructed the jury to disregard the statement.

In the light of the evidence and the district court's curative instructions, Defendants failed to demonstrate that the government's comments prejudiced their substantial rights. Accordingly, the district court did not err by denying Defendants' motion for a mistrial.

G.    Sentencing

1.    Base Offense Guideline

Fisher argues that the district court erred by imposing a four-level enhancement under Note 15 of U.S.S.G. § 2B1.1: the guideline applicable to false statement offenses. Fisher contends that the district court should have applied the guideline applicable to honest services offenses, U.S.S.G. § 2C1.3.

The government agrees that the district court's enhancement was "unguided and seemingly haphazard."[6]  In its cross appeal, the government contends that the district court erred by applying section 2C1.3 instead of section 2C1.7 to determine Defendants' base offense level.

We review de novo the district court's interpretation and application of the Sentencing Guidelines and review the factual findings underlying decisions for clear error.  United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999).

The Statutory Index lists both section 2B1.1 and section 2C1.7 as applicable to convictions under 18 U.S.C. § 1341.  See U.S.S.G. App. A.  Section 2C1.7 of the Sentencing Guidelines provides for a base offense level of 10 for fraud involving the deprivation of the intangible right to the honest services of public officials.  U.S.S.G. § 2C1.7.  Section 2B1.1 of the Sentencing Guidelines provides for a base offense level of six for various theft crimes.  Between guideline sections 2B1.1 and 2C1.7, section 2C1.7 is the most applicable to the offense of conviction.

---

[6]  The government argues that this Court could affirm because the district court could have imposed the same sentence even without the "upward departure."  The enhancement increased Fisher's guideline range from 0-6 months to 6 to 12 months.  The district court did not explicitly say it would have imposed the same sentence without the enhancement; we will consider the merits of Fisher's claims.

30

Section 2C1.7(c)(4) provides that -- if the offense is covered more specifically under section 2C1.3, the guideline section applicable to conflict of interest offenses -- the sentencing court should apply section 2C1.3. Because the offenses at issue essentially involve Hasner's failure to disclose his conflicts of interest, the district court did not clearly err by applying section 2C1.3 to Fisher and Hasner's offenses.

The district court, however, did err by relying on section 2B1.1 to enhance Fisher's sentence. Section 2C1.3 provides no cross-reference to section 2B1.1. Accordingly, we vacate Fisher's sentence and remand for resentencing.

### 2. Obstruction of Justice

The government argues in its cross-appeal that the district court erred by failing to apply an obstruction-of-justice enhancement to Fisher's sentence. The government asserts that it identified three instances of Fisher's perjury at trial that were material: (1) her denial that she sought to conceal from HFA and Main Street Realty her agreement with Hasner to compensate him; (2) her contention that Hasner's fee agreement had been disclosed to the HFA; and (3) her statement that

Hasner had earned a commission for his participation in the Tierra Vista transaction.

We review the district court's application of U.S.S.G. § 3C1.1 to the facts de novo. United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002).

Section 3C1.1 of the Sentencing Guidelines provides for a two-level increase in a defendant's base offense level if:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1. "Perjury under oath on material matters, not due to confusion or mistake," justifies an obstruction-of-justice enhancement. United States v. Hubert, 138 F.3d 912, 915 (11th Cir. 1998).

We cannot say that the district court clearly erred by refusing to enhance Fisher's base offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1. We have said that "[w]ith only a cold, paper record before it, an appellate court is severely hindered in evaluating whether a defendant perjured himself at trial. The district court is uniquely suited to make such a determination because it heard all the evidence and was able to observe a particular witness' demeanor and behavior

on the witness stand." <u>United States v. McDonald</u>, 935 F.2d 1212, 1219 (11th Cir. 1991). Although the government was able to impeach Fisher's testimony, we cannot say that the inconsistencies required an upward adjustment.

III. CONCLUSION

For the foregoing reasons, we AFFIRM Defendants' convictions. We also AFFIRM Hasner's sentence. We VACATE Fisher's sentence and REMAND for further proceedings.