[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13978
Non-Argument Calendar

_____

D. C. Docket No. 05-00048-CR-4-SPM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GABRIEL HERNANDEZ RAMOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 9, 2007)**

Before DUBINA, CARNES and HULL, Circuit Judges.

PER CURIAM:

Gabriel Hernandez Ramos appeals his conviction and 235-month sentence

imposed after a jury convicted him of possession with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii). Specifically, Ramos contends that (1) there was insufficient evidence to support his conviction; (2) the district court erred in applying the U.S.S.G. § 3C1.1 sentencing enhancement for obstruction of justice; and (3) he was denied due process rights to a fair trial. After review, we affirm.

## I. BACKGROUND

### A. Arrest and Detention Hearing

On September 16, 2005, Ramos was arrested in Live Oak, Florida after Florida Department of Agriculture ("FDOA") officers found four boxes containing 100 kilograms of cocaine during a routine inspection of a tractor trailer driven by Ramos.

At a detention hearing before a magistrate judge, Ramos testified in English without the assistance of an interpreter, although an interpreter was present. Ramos arrived in the United States in 1976 when he was seven years old, and he became a truck driver in 2000. Ramos's trailer was empty before he drove to Fresh-Pac International ("Fresh-Pac") in Oceanside, California to load a cargo of tomatoes on September 13, 2005. Ramos remained in the cab of the truck during the loading process, which took no more than thirty minutes. Ramos placed a seal

2

on the trailer door to indicate that no one opened the door during transit. Immediately following questions about the seal, Ramos was asked, "Did you put a lock on the doors?," and Ramos replied, "Yes, I did. Yes, I did. That was my lock." On cross-examination, Ramos testified again about the trailer lock and seal:

> A. He tell me whenever I–they finish.
> Q. Okay. And [Fresh-Pac employees] didn't do anything to keep you from standing there and watching?
> A. No.
> Q. Okay.
> A. They didn't say nothing.
> Q. And then you put your lock on the door?
> A. Yes, yes.
> Q. Does this trailer have a side door, too?
> A. No, it doesn't.
> Q. Just the back doors?
> A. Only one. Only the back.
> Q. You put a seal on it?
> A. Yes, I did.

After hearing this evidence, the magistrate judge found probable cause to charge Ramos and denied pretrial release. On October 4, 2005, a federal grand jury indicted Ramos for possession with intent to distribute five or more kilograms of cocaine.

**B.     Trial**

In its opening statement at trial, the government asserted that Ramos had lied at the detention hearing about placing the lock and seal on the trailer while at

3

Fresh-Pac. The government then presented the testimony of several Fresh-Pac employees and law enforcement officers who seized the cocaine from Ramos's truck.

Jose Zabala, a supervisor at Fresh-Pac, testified about the loading of Ramos's trailer on September 13, 2005. According to Zabala, Fresh-Pac inspects all boxes that enter the loading facility and requires drivers to be present at the trailer door during the loading process. Fresh-Pac's tomato boxes have holes for ventilation, unlike the boxes in which the cocaine was later found. The cocaine boxes would have been noticed at the loading facility because the loading dock is always clear. A temperature recorder is placed in the trailer upon loading. The trailer's bill of lading listed Custom-Pak in Immokalee, Florida as the purchaser of the tomato shipment.

Juan Carlos Nunez, a Fresh-Pac employee, loaded Ramos's trailer on September 13, 2005. Nunez testified that Ramos's trailer was empty when Nunez loaded it and denied loading cocaine into the trailer. Nunez recalled Ramos standing beside the truck and watching him load the first pallet of tomatoes. Nunez loaded a single pallet in front and stacked the rest in a zig-zag arrangement to distribute the weight, which made it difficult to reach the front of the trailer without crawling over the pallets. Nunez always places the temperature recorder in

4

the trailer before loading the last two pallets, but a driver might be able to reach the recorder from the back of the trailer.

The government also presented the testimony of FDOA Officer Jason Ross, who inspected Ramos's trailer in Live Oak, Florida on September 16, 2005. According to Ross, a mobile x-ray machine for commercial vehicles revealed that boxes at the front of Ramos's trailer were darker than the rest of the load. Ross broke the seal on the trailer door and removed the trailer lock. Ross crawled over the pallets in order to inspect the front of the trailer, where Ross noticed four unmarked cardboard boxes that appeared different from the tomato boxes. Ross cut one of the unmarked boxes open and saw bricks that appeared to contain cocaine. Ross crawled back over the pallets to ask Ramos where he was taking the load, and Ramos responded that he did not know. Ross testified that this response was unusual because most drivers know their destination. Ross crawled over the pallets again to retrieve the unmarked boxes for a cocaine field test.

FDOA Officer Alan Long also testified about the inspection of Ramos's trailer in Live Oak, Florida. According to Long, Ramos initially seemed relaxed when Ross entered the truck and had no difficulty communicating. After Ross began climbing over the tomato pallets, Ramos placed his arms inside the trailer, laid his forehead down on the floor of the trailer for a few seconds, and stared into

5

the back of the trailer after lifting his head.

FDOA Investigator Allen Davis testified that he found the temperature recorder in the front of the trailer near the boxes containing cocaine. According to Davis, these boxes were not "in a readily accessible portion of the load." Three load locks were found in the trailer, two of which appeared to be new. Because the bill of lading for Ramos's trailer did not contain a seal number, there was no way to determine if the seal that Ross broke before entering the trailer was placed on the trailer door at Fresh-Pac.

DEA Agent Andris described Ramos's testimony at the detention hearing. According to Andris, Ramos testified that he put a seal and trailer lock on the trailer in Oceanside, California, and he did not open the trailer until stopping at the Live Oak inspection station. Andris also described the receipts and driver's log book found in Ramos's truck cab. These receipts showed that Ramos purchased a trailer lock at 12:04 a.m. and two load locks several minutes later in Eloy, Arizona on September 14, 2005. Andris noted that Eloy is 182 miles west of San Simon, Arizona, where Ramos's log book claimed he was sleeping at midnight, and that Ramos's log book made no mention of Eloy, Arizona. Based on Andris's twelve years of experience in narcotics cases, Andris claimed that drug traffickers could try to conceal drug shipments with a legitimate load.

6

At the close of the government's case,[1] Ramos moved for a judgment of acquittal, which the district court denied.

Ramos then testified without the assistance of an interpreter, although one was present at trial. Ramos was working for California Express Cooler in September 2005 when Raul Vega asked Ramos to pick up a trailer to transport a shipment for Fresh-Pac. Ramos repeated his detention hearing testimony that the trailer was empty before he drove it to Fresh-Pac for loading. As to his detention hearing testimony about the trailer lock, Ramos stated that he had meant to say that he locked the trailer during the trip, not at Fresh-Pac. Ramos claimed that he broke the original seal and opened the trailer during the trip to place two new load locks in the trailer in Eloy, Arizona. Ramos also attempted to clarify the discrepancy in his log book about the Eloy stop. Ramos claimed that he did not record the Eloy stop because he did not have to record stops under ten minutes. Ramos stated that his entry showing a midnight rest stop in San Simon, despite the receipts indicating that he was nearly two hundred miles away at midnight, was accurate because he

---

[1]The parties stipulated that (1) the unmarked boxes in Ramos's trailer contained cocaine with a net weight of 99.39 kilograms; (2) none of the fingerprints found on the cocaine wrappings matched Ramos, Zabala, or Nunez; and (3) Ramos's temperature recorder registered a nearly constant temperature of fifty-two degrees for the first sixty-five hours of the trip, followed by a slight rise in temperature to sixty degrees for four hours, a rise to ninety degrees an hour later, and a steady temperature of seventy-five degrees for the remainder of the trip.

recorded all times in Pacific Standard Time.[2]

On cross-examination, Ramos stated that he may have been confused when he recorded in his log book that he was sleeping in San Simon at midnight, but he also confirmed that he "live[d] by these log books." Ramos claimed that he threw the temperature recorder on top of the cargo in the trailer and suggested that it was a coincidence that it landed at the front of the trailer.

In its closing argument, the government noted Ramos's inconsistent statements about the seal and trailer lock and asserted that Ramos lied in his log book entries. The government also suggested that a drug dealer would not entrust such a large quantity of cocaine–100 kilograms–to an unknowing driver.

At the close of trial, Ramos renewed his motion for judgment of acquittal, which the district court denied. The jury found Ramos guilty.

## C.    Sentencing

The presentence investigation report ("PSI") set Ramos's base offense level at 36, pursuant to U.S.S.G. § 2D1.1(c)(2), because his offense involved at least 50 but less than 150 kilograms of cocaine. The PSI recommended a 2-level

---

[2]Based on Ramos's testimony, the jury knew that there was either a one-hour difference or no difference between Mountain Standard Time in Arizona and Pacific Standard Time recorded in his log book, depending on whether Arizona observes Daylight Savings Time. Even assuming that the jury believed that a one-hour time difference existed, Ramos would have had to have driven 182 miles from Eloy to San Simon in less than an hour in order for his log book to be correct.

enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, because Ramos's testimony at the detention hearing provided the false impression that the trailer had not been opened after leaving Fresh-Pac and that the trailer was locked at Fresh-Pac. With a total offense level of 38 and a criminal history category of I, the advisory guidelines range was 235 to 293 months' imprisonment.

Prior to sentencing, Ramos objected to the § 3C1.1 enhancement, arguing that he never stated that he applied the seal at Fresh-Pac and never said that the cocaine must have been loaded at Fresh-Pac. The government agreed that Ramos never stated that the cocaine must have been loaded at Fresh-Pac, but it noted Ramos's inconsistent testimony about opening and locking the trailer.

At sentencing, Ramos reiterated his objection to the § 3C1.1 enhancement. After noting that Ramos did not object to sections of the PSI detailing his inconsistent testimony, the district court found that Ramos provided different answers about whether he entered the trailer after leaving Fresh-Pac and whether he locked the trailer at Fresh-Pac. The district court thus denied Ramos's objection to the § 3C1.1 enhancement. After noting its consideration of the sentencing factors in 18 U.S.C. § 3553(a), the district court sentenced Ramos to 235 months' imprisonment, the low end of the advisory guidelines range.

## II. DISCUSSION

## A.    Sufficiency of the Evidence

On appeal, Ramos contends that the government presented insufficient evidence that he had knowing possession of the cocaine.[3]  In order to convict Ramos under 21 U.S.C. § 841(a)(1), the government must prove beyond a reasonable doubt that he had knowing possession of cocaine with the intent to distribute it.  See United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006).  In order to establish knowing possession, the government may show actual or constructive possession and can prove possession with direct or circumstantial evidence.  Id.  "Constructive possession exists where the defendant had dominion or control over the drugs or over the premises where the drugs were located."  Id.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to the government, we conclude that the government presented sufficient evidence to establish constructive possession.  Ramos testified that the trailer was empty when he took possession of it, and Ramos and Nunez both testified that the trailer was empty when it arrived at Fresh-Pac for loading.  There is no dispute that Ramos had exclusive dominion and control over the trailer from loading at Fresh-Pac to the inspection in Live Oak, Florida.  Because Ramos had exclusive control

---

[3]We review a challenge to the sufficiency of the evidence de novo, and view all evidence and make all reasonable inferences in the light most favorable to the government.  See United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006).

10

over the premises where the cocaine was found, the government established constructive possession of the cocaine. See United States v. Molina, 443 F.3d 824, 829 (11th Cir. 2006).

Furthermore, the government presented sufficient evidence from which the jury reasonably could infer that Ramos knew about the cocaine. Viewing the evidence in the light most favorable to the government, the jury reasonably could conclude that the cocaine boxes were not loaded on the trailer at Fresh-Pac but were loaded after Ramos departed from Fresh-Pac, at which point the trailer was under Ramos's exclusive control.[4] First, the cocaine boxes did not have ventilation holes like Fresh-Pac's tomato boxes and thus would have been noticed in Fresh-Pac's loading area. Nunez, the Fresh-Pac employee who loaded the trailer, denied loading cocaine on the trailer, and the jury reasonably could have credited his testimony. Second, while the trailer was loaded at Fresh-Pac, Nunez placed the temperature recorder in the rear of the trailer. However, FDOA officers at Live Oak found the recorder at the front of the trailer near the cocaine boxes, which further indicates that the trailer was opened after Ramos left Fresh-Pac and the recorder was moved during the loading of the cocaine boxes.

---

[4]At trial, the government argued that no matter whether the cocaine was loaded at Fresh-Pac or after Ramos left Fresh-Pac, Ramos knew about the cocaine either way. We review the evidence pointing to the cocaine being loaded after Fresh-Pac when Ramos was in exclusive control of the vehicle.

11

Third, receipts for the load locks and trailer lock purchased in Eloy indicated that Ramos falsified his log book entries by not mentioning the Eloy stop, even though Ramos agreed that he "live[d] by these log books." A reasonable jury could have disbelieved Ramos's explanation for these false entries and concluded that Ramos attempted to cover up illegal activities by making false entries in his log book. Fourth, when FDOA Officer Ross conducted his inspection of the trailer cargo at Live Oak, Ramos had a downcast demeanor, placing his arms inside the trailer and his forehead on the trailer floor. See United States v. Munoz, 16 F.3d 1116, 1125 (11th Cir. 1994) (noting that a defendant indicated his "awareness of and participation in the [drug] scheme" by lowering his head when the Coast Guard escorted his boat carrying illegal drugs). Given this evidence, the jury reasonably could have inferred that Ramos was aware of the illegal cargo in his trailer and was thus despondent that the inspector would find it.

Fifth, the jury also reasonably could infer Ramos's knowledge and guilt based on inconsistencies in his testimony. After answering questions about the loading process at Fresh-Pac, Ramos testified at the detention hearing that he "then" put on the trailer lock. At trial, however, the government presented receipts demonstrating that Ramos did not lock the trailer until purchasing a lock in Eloy. Although Ramos stated at trial that he had meant to say that he locked the trailer

12

later in the trip, not at Fresh-Pac, the jury was free to infer that Ramos gave a false impression in his detention hearing testimony. See Thompson, 473 F.3d at 1142 (noting that we defer to the jury's credibility determinations and assume that they made them in a way that supports the verdict). After discussing Fresh-Pac at the detention hearing, Ramos also testified that he applied a seal to his trailer to indicate that "nobody opens my doors," but he mentioned nothing about opening the trailer after leaving Fresh-Pac or resealing or locking the trailer door. At trial, after the government presented evidence that Ramos bought load locks in Eloy, Ramos testified that he opened the trailer during the trip and resealed the trailer door.

The jury had the opportunity to evaluate the truthfulness of Ramos's testimony in light of his prior statements at the detention hearing. If the jury concluded that Ramos lied, it was fully entitled not only to infer that the opposite of Ramos's testimony was true, but also to consider his false statements as substantive evidence of his guilt. See id. at 1143; United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995).

Based on the totality of the evidence outlined above, we conclude that the government presented sufficient evidence of Ramos's knowing possession of

cocaine to support his conviction.[5]

**B.      Obstruction-of-Justice Enhancement**

Ramos also contends that the district court erred in imposing a 2-level enhancement to his offense level for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.[6]  Section 3C1.1 provides for a 2-level increase in the offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" with respect to the "investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to the defendant's offense of conviction."  U.S.S.G. § 3C1.1.  The § 3C1.1 enhancement applies if a defendant commits perjury pertaining to conduct that forms the basis of the offense of conviction or provides materially false information to a judge or magistrate.  U.S.S.G. § 3C1.1 cmt. n.4(b), (f).  For purposes of applying this enhancement, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  United States v. Bradberry, 466 F.3d 1249, 1254 (11th Cir. 2006) (quotation omitted).

---

[5]Ramos does not contest that his intent to distribute cocaine can be inferred from the large quantity of cocaine seized in his trailer.  See United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005).

[6]We review a district court's application and interpretation of the sentencing guidelines de novo and its factual findings for clear error.  United States v. Owens, 447 F.3d 1345, 1346 (11th Cir. 2006).

On appeal, Ramos contends that any inconsistent testimony resulted from confusion due to his limited fluency in English, not a willful intent to provide false testimony. However, Ramos never indicated that he had difficulty understanding or speaking English during either the detention hearing or the trial. Ramos had the option of testifying with the assistance of an interpreter, who was present at both the detention hearing and trial, but Ramos chose to testify in English. At trial, FDOA Officer Long testified that Ramos had no difficulty understanding English during his questioning at the Live Oak inspection center. Because the district court was uniquely suited to make a determination that Ramos was not confused based on this testimony and its observation of Ramos's expression and demeanor on the witness stand, we cannot say that the district court clearly erred in concluding that Ramos had willful intent to provide false testimony. See United States v. Hasner, 340 F.3d 1261, 1277 (11th Cir. 2003); United States v. Williams, 340 F.3d 1231, 1240-41 (11th Cir. 2003).

Furthermore, the evidence at trial and the undisputed statements in the PSI amply support the district court's factual finding that Ramos offered false testimony. Accordingly, the district court's application of the § 3C1.1 enhancement was not clearly erroneous. See Hasner, 340 F.3d at 1277.

C.     **Due Process Rights**

Lastly, Ramos contends for the first time on appeal that he was denied due process and a fair trial by the government's assertions in its opening statement and closing argument that Ramos lied at his detention hearing and its suggestion in closing argument that Ramos had connections with the drug trade.[7] However, Ramos has shown no error, much less plain error. First, the government provided evidence that Ramos had not testified truthfully and was permitted to claim that Ramos lied. Second, the government did not suggest that Ramos had connections with the drug trade in its closing argument. While the government posed a hypothetical question whether a drug dealer would leave such a large quantity of cocaine with an unsuspecting driver, it was clear that the government was not implying that Ramos was connected with the hypothetical drug dealer in particular. Ramos has not shown that his due process rights were violated.

### III. CONCLUSION

For the foregoing reasons, we affirm Ramos's conviction and sentence.

**AFFIRMED.**

---

[7]When a defendant fails to object to an alleged error in the district court, we review for plain error. See United States v. Raad, 406 F.3d 1322, 1323 (11th Cir. 2005). "Plain error occurs where (1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Id. (quotation marks omitted).