# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 06-1889

_____

United States of America,        *

                       *

        Plaintiff - Appellee,   *

                       *      Appeal from the United States

      v.                  *      District Court for the District

                       *      of Minnesota.

Loren George Jennings,     *

                       *

        Defendant - Appellant.   *

_____

Submitted: November 13, 2006
Filed: June 6, 2007

_____

Before LOKEN, Chief Judge, LAY[1] and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Loren George Jennings, a former member of the Minnesota House of Representatives, was convicted by a jury of mail fraud, in violation of 18 U.S.C. §

_____

[1]The Honorable Donald P. Lay assumed permanent disability retirement status on January 3, 2007, and died on April 29, 2007. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. R. 47E.

1341, and money laundering, in violation of 18 U.S.C. § 1957. The district court[2] sentenced Jennings to forty-eight months' imprisonment and ordered restitution and forfeiture of the funds that benefitted him personally. Jennings appeals, arguing that: (1) the evidence was insufficient to support a conviction for mail fraud; (2) the district court erred in its jury instructions; (3) the district court erred in admitting certain evidence; (4) the district court erred in its application of the advisory Sentencing Guidelines; and (5) the district court erred in ordering Jennings to forfeit his personal gain from the scheme. We affirm.

I.      Background

A.      The Parties

Jennings was elected to the House of Representatives for the State of Minnesota in 1984 and served through 2002. In 1997 and 1998, Jennings served as chairman of the House Regulated Industries Committee, a committee that addressed legislation affecting utility companies. After the Republican Party took control of the House in 1999, Jennings remained the ranking minority member on the committee.

In addition to being a legislator, Jennings owned two separate businesses. Jennings was the president of M&M Sanitation, Inc. ("M&M"), a garbage-hauling business located in Cambridge and Rush City, Minnesota. Jennings owned approximately 42.5 percent of M&M. He had two co-shareholders: Brad Cook, the secretary/treasurer, who also owned approximately 42.5 percent of M&M, and Jerry Moses, the chief financial officer, who owned approximately fifteen percent of M&M. Jennings was also a fifty-percent partner with Brad Cook in Cook & Jennings

_____

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

-2-

Properties ("C&J Properties"), a partnership that owned various real estate and commercial properties.

One of Jennings's business associates, John James, was a banker at the Town & Country Bank in Almelund, Minnesota. Town & Country Bank lent money to a business called Poletech, and the loan became a problem loan for the bank. In 1997, James asked Jennings to make a loan to Poletech for a short period of time while new investment money could be found for Poletech. Poletech was attempting to develop a "hollow veneer" utility pole, an alternative to traditional wood-cut poles.

In April 1997, James formed a new company, Northern Pole, to purchase the assets of Poletech. Northern Pole's corporate resolution listed George Vitalis and Robert Warnke, both close friends of James, as the company's officers and directors. Warnke was never active in the company and ultimately resigned and relinquished his shares. Initially, Vitalis was a shareholder and officer, but did not actively participate in Northern Pole. Until the Town & Country Bank closed in May 2000, James controlled the Northern Pole bank account.

B.    The Loans

1.    M&M

Jennings talked to his two co-shareholders about M&M making a "bridge loan" to Northern Pole. Jennings proposed to the other shareholders that M&M lend $315,000 to Northern Pole. Although they did not see a reason to go forward with the loan, Jennings's co-shareholders ultimately agreed to do so because Jennings wanted to do it and agreed to be personally responsible for the loan. Jennings's co-shareholders knew nothing about Northern Pole and did no investigation.

On April 30, 1997, M&M borrowed $315,000 from Town & Country Bank, which M&M in turn lent to Northern Pole. In return, Northern Pole provided M&M with a promissory note for $315,000. The promissory note was short term, with a due date of August 1, 1997.

On July 30, 1997, M&M executed an extension for its loan from Town & Country Bank. Additional extensions were signed on October 31, 1997, on January 15, 1998, and on March 15, 1998. Jennings's co-shareholders became increasingly upset about the situation.

M&M did not record the transaction in its financial statements prepared by Secretary/Treasurer Moses and the company accountant. M&M did not include the $315,000 loan from the bank as a liability or the Northern Pole promissory note as an M&M asset. When asked why the transaction did not appear in M&M's financial statement, Moses explained that the Town & Country Bank loan would be paid by either Northern Pole, James (who had personally guaranteed the Northern Pole loan), or Jennings.

### 2. C&J Properties

On April 24, 1998, a year after the first loan, Jennings and his partner Cook borrowed an additional $355,000 from the Town & Country Bank and lent it to Northern Pole through C&J Properties. As in the previous transaction, Northern Pole provided a promissory note to C&J Properties for $355,000. This note, however, called for quarterly payments with the final payment to take place in 2003. Thus, by the end of April 1998, Jennings had personally guaranteed loans to Northern Pole totaling $670,000.

C.    Funding Northern Pole/The Conservation Improvement Program

Sometime in early 1998, Jennings approached a high-level executive at Northern States Power ("NSP"),[3] Tom Micheletti. Micheletti testified that, at that time, Jennings's position as the chairman of the House Regulated Industries Committee made him an important legislator to NSP in terms of carrying out its legislative agenda. At a meeting in Jennings's House office, Jennings requested that NSP fund a company called "Northern Pole" or "Poletech" with several hundred thousand dollars.

Jennings indicated to Micheletti that he had an interest in Northern Pole in addition to it being a constituent. Micheletti was concerned by the apparent personal interest Jennings had in the proposal. Micheletti ultimately determined not to go forward with Jennings's request because, as he testified, "it was unclear to me whether or not Representative Jennings was involved financially with this."

Jennings then asked Micheletti whether NSP could fund Northern Pole using conservation funds from the Conservation Improvement Program ("CIP"). Under the CIP, Minnesota requires utility companies to collect a surcharge from their customers to be used on conservation projects, such as giving rebates to customers who purchase appliances that conserve energy. Minn. Stat. § 216B.241 (2006). Micheletti told Jennings that Jennings would need to disclose any interest he had in Northern Pole before NSP could participate. Jennings did not contact Micheletti again, and Micheletti left NSP in 1999. At the time Jennings made his suggestion to Micheletti, Jennings acknowledged that the CIP would need to be amended to permit funding this type of project with conservation funds.

---

[3]NSP is now known and doing business as Xcel Energy, Inc.

In early summer 1998, after a fire at its work site, Northern Pole changed its business direction. Based on information obtained by Jennings, Northern Pole abandoned its plan to build alternative utility poles and began researching methods by which utility companies could dispose of chemicals that were used to treat traditional wood-cut utility poles. By December 1998, Northern Pole still had not repaid M&M or C&J Properties. Jennings's business associates for both M&M and C&J Properties were demanding repayment and refusing to sign further extensions.

On December 9, 1998, Jennings's business associates called a meeting with Jennings, M&M's and C&J Property's attorney, and John James. In that meeting, Jennings's business associates learned that Northern Pole had lost its licensing rights to a patent related to the alternative poles. Northern Pole's only value, as far as Jennings's business associates knew, was a financial incentive through the CIP. There were no other potential investors or sources of funds. By the end of 1998, Northern Pole had no work site, no license for alternative poles, no researchers, and no assets, but it did carry substantial debt. At the meeting, Jones pledged his shares in Town & Country Bank as collateral for M&M and C&J Property's loans to Northern Pole.

D.     Changes in the CIP Legislation

By fall of 1998, Jennings was already discussing obtaining funds through the CIP and had votes lined up to pass legislation necessary to change the CIP to permit Northern Pole to obtain conservation funds. On March 15, 1999, Jennings introduced a new bill to expand the scope of the CIP to include research and development projects. Jennings told lobbyists the CIP legislation was for a constituent. As the bill's chief proponent, Jennings spoke on behalf of the bill, and it was passed out of a subcommittee of the Commerce Committee. On March 18, 1999, Jennings spoke at the full Commerce Committee meeting on behalf of the bill, and the committee members voted to send the bill for a floor vote before the full House. Given his status on the Regulated Industries Committee, as well as his expertise in the field, Jennings

carried great weight with his colleagues in the area of utility regulation.  On May 3, 1999, Jennings voted in the House to pass the CIP legislation.  It passed 128-0, and the governor signed it into law.

Section 216B.241, the CIP authorizing statute, was thus amended to include two new groups of  "projects" in the definition of "energy conservation improvement": those that "seek[] to provide energy savings through reclamation or recycling and that [are] used as part of the infrastructure of an electric generation, transmission, or distribution system within the state or a natural gas distribution system within the state," and those that "provide[] research or development of new means of increasing energy efficiency or conserving energy or research or development of improvement of existing means of increasing energy efficiency or conserving energy."  Pursuant to the amended law, "[e]ach public utility . . . may spend and invest annually up to 15 percent the total amount required to be spent and invested . . . on research and development projects."  At no time during the legislative process did Jennings disclose his personal financial interest in Northern Pole.

E.    Requests for CIP Payments

In June 1999, Jennings had a legislative staffer research the amount of money utility companies spent each year under the CIP.  Jennings gave this information to James, who in turn calculated that Northern Pole should seek a percentage of the CIP conservation funds from various utility companies.  James provided a target of $1.4 million to Jennings, which then became the "budget" that Northern Pole provided utility companies.  During this time, James and Jennings brought George Vitalis back to act as the nominal president of Northern Pole in meetings with Jennings and utility companies.  Jennings and James explained the plan to obtain CIP funds from the utility companies to repay the loans to Jennings.  Vitalis agreed to help.

During the 1999 legislative session, Jennings approached utility company lobbyists for NSP and Minnesota Power,[4] seeking their support for his legislation to amend the CIP to include research and development projects. After the legislation was enacted, Jennings approached these same lobbyists for assistance in getting the utility companies to provide CIP funds to Northern Pole. Jennings arranged and attended meetings with utility company officials and Vitalis.

Jennings and Vitalis met with company officials to pitch the Northern Pole proposal. Jennings told company officials that Northern Pole was a constituent and stated that he had no other interest in Northern Pole. Jennings made it clear at the meeting that the project was important to him, and the utilities decided to fund Northern Pole.[5] Company officials testified that during internal discussions at both companies, officials worried about Jennings's reaction if they declined to participate. One employee was told the decision to fund Northern Pole was a result of the "influence and pressure applied by Loren Jennings."

F.     CIP Funding and Repayment on the Loans

Within months of the expansion of the CIP, Minnesota Power and NSP began funding Northern Pole using CIP conservation funds. On September 3, 1999, NSP made a $150,000 payment of CIP funds to Northern Pole. John James deposited the funds into the Northern Pole account. Days later, James made a payment of $110,000 on M&M's loan with Town & Country Bank and a $10,840 payment on the C&J Properties loan. These funds came directly from the CIP funds provided by NSP.

---

[4]Minnesota Power is a division of Allete, Inc.

[5]Jennings and Vitalis also met with officials from two other utility companies—Otter Tail Power Company and Great River Energy Company—but both companies decided not to fund the Northern Pole project.

On October 20, 1999, Minnesota Power made a $250,000 payment of CIP funds to Northern Pole. Again, James deposited the funds into the Northern Pole account. On October 25, 1999, James used the conservation funds to make a $81,878.82 payment on M&M's loan and another payment of $10,840 on the C&J Properties loan. These funds came directly from the CIP funds provided by Minnesota Power.

Although Jennings told James he did not want to know the details of the payments, James and Jennings did discuss the payment status of the loans. Jennings did not tell his business associates that he was making payments on the loans with CIP funds. In late 1999, contrary to M&M company policy and in violation of corporate bylaws, Jennings began signing loan extensions by himself. The extension documents reflected the fact that Northern Pole had made payments to M&M and C&J Properties.

Because CIP conservation funds are essentially public funds to be used for the public's benefit, CIP projects must be approved by the Minnesota Department of Commerce. NSP and Minnesota Power did not seek approval from the Minnesota Department of Commerce until after the first CIP payments were made to Northern Pole. The Department of Commerce staff had concerns about the Minnesota Power proposal to provide $250,000 of conservation funds to Northern Pole. Jennings approached then-Commissioner of Commerce Steve Minn about the Minnesota Power proposal and told him that Minnesota Power's funding of the program had gotten ahead of the approval "by accident." Jennings requested, and received "accommodation." Commissioner Minn approved the Minnesota Power expenditure.

In September 1999, a citizen named Gary Olson learned from contacts within NSP that NSP was going to provide grant money to Northern Pole. Olson had a company named Product Recovery, Inc., a company already in the business of providing utility recycling services to NSP. Olson became concerned for his business and began to investigate Northern Pole and the CIP legislation passed in 1999. Olson sought Northern Pole records at the Secretary of State's office and Jennings's

disclosure filings. Olson did not find any financial association between Northern Pole and Jennings in the disclosures. Olson began writing letters to the Department of Commerce and legislators complaining that Northern Pole was getting special treatment because of Jennings.

In December 1999, Jennings met with Olson. Jennings told Olson that Jennings was not involved with Northern Pole; he claimed he was just helping a constituent. Jennings indicated he had been unaware of any other companies that were providing pole services and assured Olson that Product Recovery, Inc. could get CIP funds as well. Jennings asked Olson to send a letter to the Department of Commerce retracting his earlier complaints. During a telephone conversation that Olson surreptitiously recorded, Jennings indicated that Northern Pole would be receiving approximately $600,000 in CIP funds. Olson drafted a letter retracting his complaints, faxed it to Jennings for his approval, and sent it to the Department of Commerce on December 10, 1999.

In early 2000, Jennings learned that the Department of Commerce staff was recommending that the Commissioner not approve NSP's proposed funding for Northern Pole. The staff was concerned that the proposal had no demonstrated energy savings and that "the project was basically dreamed up to benefit somebody in Representative Jennings's district." Jennings called the new Commissioner of Commerce, Jim Bernstein, to a meeting to promote the Northern Pole funding proposal. During this meeting, Jennings indicated that Northern Pole was a constituent and that the proposal was important to him. Jennings did not disclose any personal financial interest in the proposal.

On March 1, 2000, Jennings wrote a letter to Commissioner Bernstein on Jennings's official House of Representatives stationery stating that, as the author of the legislation, he intended the CIP legislation to permit exactly this kind of funding. On March 7, 2000, Bernstein approved the prior and future funding of Northern Pole

from CIP funds. The decision required an open bidding process to permit other potential bidders to receive CIP funds. Ultimately, the only company to receive research and development funds for pole recycling from Minnesota Power was Northern Pole, and the only companies to receive CIP funds from NSP were Northern Pole and Product Recovery, Inc. Product Recovery, Inc. only received these funds for services it had already been providing; not for research or development. No other company ever received any CIP funds for research and development.

As part of its decision, the Department of Commerce also required an accounting of the CIP funds Northern Pole had received in 1999. In May 2000, Jennings, James, and Vitalis fabricated a report that purported to account for the expenditure of CIP funds already obtained by Northern Pole. Jennings personally delivered the report to the utility companies.

In May 2000, the Town & Country Bank closed due to its insolvency and improprieties. Ultimately, James was indicted and pleaded guilty to bank fraud. Before the bank closed, James and Jennings prepared a letter for the bank examiners, signed by Jennings, regarding the bank loans made to Jennings's entities. James testified that Jennings signed the letter even though Jennings knew it included false information. Shortly thereafter, the FDIC sent loan verifications to M&M and C&J Properties to verify that they still owed $149,000 and $333,951.67, respectively, on the loans they took on behalf of Northern Pole. The loan verifications reflected the payments that were made using CIP funds. Jennings filled out the verifications, confirming the amounts still owed. The FDIC took over the M&M and C&J Properties loans after Town & Country Bank's closure. After the bank closed, Vitalis moved the Northern Pole checking account, and James had no further involvement in the financial affairs of Northern Pole.

In the fall of 2000, M&M repaid the FDIC for its loan and was in turn reimbursed in full by C&J Properties. In order to pay off the FDIC for the C&J

Properties loan as well as reimburse M&M, Jennings made arrangements for C&J Properties to borrow approximately $425,000 from the Lake Area Bank. Payments were made on the Lake Area Bank loan from both C&J Properties and M&M, but Jennings's business associates deemed the payments to have been made on Jennings's behalf and kept track of how much Jennings personally owed them.

In the following years, Jennings persisted in his requests to NSP for further funding. On July 24, 2000, NSP made another $100,000 payment of CIP funds to Northern Pole. The same day, Vitalis wrote a $10,840 check to the FDIC, as payment for the C&J Properties loan. On September 13, 2000, Vitalis wrote a $20,000 check to the FDIC as another payment for the C&J Properties loan. These funds came directly from the CIP funds provided by NSP.

On May 4, 2001, NSP mailed a third $100,000 payment of CIP funds to Northern Pole. On June 2, 2001, Vitalis wrote a $15,000 check to the Lake Area Bank. These funds came directly from the CIP funds provided by NSP. Jennings told Secretary/Treasurer Moses to use the check Vitalis had written to pay down the Lake Area Bank loan, which Moses did. At or near the time of the 2000 and 2001 payments, telephone records reflected contacts between Jennings, a NSP lobbyist, and Vitalis.

The last payment came on February 14, 2002, when NSP paid Northern Pole $50,000 of CIP funds. On February 22, 2002, Vitalis wrote a $25,000 check payable to the Lake Area Bank. These funds came directly from the CIP funds provided by NSP. Again, Jennings told Moses to use the check Vitalis had written to pay down the Lake Area Bank loan, which Moses did.

From 1999 to 2002, Northern Pole received $650,000 in CIP funds from Minnesota Power and NSP. In return, Northern Pole provided the utilities with a three-ring notebook of research. Northern Pole had paid Jessica Vitalis, who was

Vitalis's daughter-in-law and had no scientific background, approximately $35,000 to complete the research,[6] which consisted of a survey of research already done in the field. According to testimony at trial, the report had no value to the utility companies. Of the $650,000 of conservation funds obtained by Northern Pole, $284,398 was used to make payments on loans held in the names of M&M and C&J Properties.[7]

G.    Investigation, Trial, and Sentencing

As part of the investigation into the failure of the Town & Country Bank and John James, federal investigators interviewed Jennings on January 29, 2003. Jennings acknowledged that he was an "investor" in Northern Pole with an "equity position" and said he had an "oral agreement" with Northern Pole to receive a share of the future revenues of the business project if and when the project became profitable. Jennings also acknowledged that he had authored CIP legislation that benefitted Northern Pole, and that he had met with a division head of NSP on behalf of Northern Pole. However, Jennings claimed there was no conflict of interest because he received no "current financial benefit" to himself. Any benefit he would receive, he contended, would not occur until the future, when he was out of the legislature.

On April 19, 2005, a grand jury returned a seven-count superseding indictment against Jennings. The indictment charged Jennings with four counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. The indictment alleged that Jennings was guilty of depriving the citizens of Minnesota of the intangible right to the "honest and faithful services" he owed to them in his capacity

---

[6]Jessica Vitalis hired a consultant to help with her research. That consultant was paid approximately $10,000 of the $35,000.

[7]In the superseding indictment, the government charged that approximately $273,558.82 of the CIP payments to Northern Pole benefitted Jennings personally. The district court found at sentencing that $284,398 personally benefitted Jennings. For factual purposes, we use this number as well.

-13-

as a state representative. The indictment also charged Jennings with one count of conspiracy to commit honest services mail fraud, under 18 U.S.C. § 371, and two counts of money laundering, under 18 U.S.C. § 1957. The indictment charged that the money from the scheme that benefitted Jennings personally be forfeited to the government, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1). The case proceeded to trial.

At trial, the government called James Bernstein, Minnesota Commissioner of Commerce from July of 2000 to January of 2003, and the man who had approved NSP's proposal to provide CIP funds to Northern Pole. The government asked Bernstein whether the fact of Jennings's financial interest in NSP's CIP proposal would have affected Bernstein's analysis of that proposal. Jennings objected to the government's question on the grounds that it was a hypothetical question that assumed Jennings's guilt. The district court overruled Jennings's objection. Bernstein testified that knowing Jennings had a financial interest in the CIP proposal "[a]bsolutely" would have affected his analysis. Bernstein stated that the Commission "would have rejected the proposal. You can't do a CIP proposal to someone who's got a vested interest in it. You can't do it." When asked again on cross-examination, Bernstein testified, "[m]y conclusion is that—and I can say this emphatically—that any legislator who had a financial interest in a company that was asking us to approve a CIP proposal, if they would have disclosed that, we would never, ever have awarded that money."

The government also offered into evidence a note that Jessica Vitalis authenticated as having been written in George Vitalis's handwriting. The note summarized a July 24, 2000 conversation George Vitalis had with Jennings, in which Jennings provided the names and phone numbers of officials at NSP involved in the CIP funding request, along with details of the loan repayment to the FDIC for the Town & Country loan extended to M&M. Jennings objected to the introduction of the note on hearsay, Confrontation Clause, and foundational grounds. The district court

-14-

admitted the note into evidence as a statement by a co-conspirator pursuant to Federal Rule of Evidence 801(d)(2)(E).

During trial, the court solicited proposed jury instructions from both parties. Jennings's proposed theory of defense stated that "[i]f you find that the government has not proven Mr. Jennings intentionally failed to comply with the disclosure standards set by the State of Minnesota with respect to his sponsorship of the CIP legislation, then he acted in good faith and lacked the requisite intent to defraud." The government's proposed instructions regarding what it must prove before Jennings could be convicted for honest services mail fraud stated, in pertinent part, that "[a] public official has an affirmative duty to disclose material information to the public employer."

The court rejected Jennings's proposed instruction, and instructed the jury in Instruction No. 9B that:

> A public official has a duty to disclose material financial information to the public employer. When an official fails to disclose a material financial interest in a matter over which he has decision-making power, the public is deprived of the intangible right to the official's honest services, whether or not a tangible loss to the public is shown. To decide what constitutes material financial information, you may consider the standards and rules set by a person's employer, in this case the Minnesota House of Representatives.

> However, the mail fraud statute does not encompass every instance of official misconduct, even reprehensible misconduct resulting in the official's personal financial gain. That is because the government must prove, beyond a reasonable doubt, that the official intended to defraud the public of its right to his honest services.

The court thus adopted the substance of the government's proposed instruction regarding a public official's duty to disclose information. Jennings also objected to

Instruction No. 9B on the grounds that the jury should have been instructed that the government was required to prove gain or loss.

The jury convicted Jennings of two counts of mail fraud and one count of money laundering. The jury acquitted Jennings on the remaining charges.

At the sentencing hearing, Jennings objected to the court's application of United States Sentencing Guideline § 2C1.7, the guideline provision entitled "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials."[8] Jennings argued that the court should instead apply § 2C1.3, the Guideline provision concerning "Conflict[s] of Interest," which is referenced in §2C1.7. The district court found that § 2C1.7 was the proper guideline provision under the facts of this case, stating that Jennings's offense of conviction was not covered more specifically under § 2C1.3.

Using U.S.S.G. § 2C1.7, the district court determined that Jennings had a base offense level of ten. The court then determined the loss amount to be $284,398, which resulted in a twelve-level enhancement. See U.S.S.G. §§ 2C1.7(b)(1)(A)(ii) and 2B1.1(b)(1)(G). After adding one level for the money laundering conviction, see U.S.S.G. § 2S1.1(b)(2)(A), Jennings's total offense level was twenty-three. When combined with a Category I criminal history, Jennings was subject to an advisory Guidelines range of forty-six to fifty-seven months in prison. The court sentenced Jennings to forty-eight months' imprisonment and ordered Jennings to forfeit the proceeds from the scheme that benefitted him personally, an amount of $284,398. The district court also ordered restitution in the amount of $284,398, to Minnesota Power and NSP. Thus, the court ordered Jennings to pay a total of $568,796.00.

---

[8]The district court used the November 1, 2001 version of the Sentencing Guidelines Manual.

Jennings now appeals his conviction and sentence.  Jennings first argues that the evidence was insufficient to support his conviction.  Specifically, Jennings argues that the government did not present evidence sufficient to prove that Jennings had a duty to disclose his interest in Northern Pole.  Second, Jennings contends that the district court erred in instructing the jury in two respects: the jury should have been instructed that the government was required to prove a violation of state law, and the jury should have been instructed that the government was required to prove gain or loss in an honest services mail fraud scheme.  Third, Jennings challenges two of the district court's evidentiary rulings.  Jennings argues that the court erred in allowing Commissioner Bernstein to testify that the disclosure of Jennings's financial interest in the NSP's grant of CIP funds to Northern Pole would have resulted in the Commission's rejection of the proposal.  He also argues that the district court erred in admitting George Vitalis's handwritten note pursuant to Federal Rule of Evidence 801(d)(2)(E) because the government "failed to link the note to a conspiracy." Fourth, Jennings contends that the district court erred by ordering Jennings to forfeit $284,398.  Jennings argues that an order of forfeiture was only authorized under the money laundering offense and not the mail fraud offense, that the order violated the Ex Post Facto Clause, and that the forfeiture order was barred by a one-year statute of limitations.  Jennings does not challenge the court's restitution order.  Finally, Jennings argues that the district court erred by applying U.S.S.G. § 2C1.7, rather than § 2C1.3.  We address each of Jennings's arguments in turn.

II.    Analysis

A.    Sufficiency of the Evidence

Jennings first argues that the evidence presented at trial was insufficient to support his conviction for honest services mail fraud.  Jennings contends that the government did not prove Jennings had a duty to disclose his financial interest in Northern Pole to the State of Minnesota or the utility companies.  "We review the

sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Timlick, 481 F.3d 1080, 1082 (8th Cir. 2007) (quotation omitted). We will "reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (quotation omitted).

Section 1341 prohibits the use of the mails to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Thus, to convict Jennings of mail fraud, the government was required to prove "(1) the existence of a scheme to defraud, and (2) the use of the mails . . . for purposes of executing the scheme." United States v. Hawkey, 148 F.3d 920, 924 (8th Cir. 1998) (quotation omitted). The term "scheme or artifice to defraud" includes a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.[9]

Before we can determine whether the government presented sufficient evidence that Jennings had a duty to disclose his financial interest in Northern Pole, we must first discuss what constitutes a "scheme to defraud" under these circumstances. Chief to our inquiry in cases involving a public official have been the questions of whether the public official misused a discretionary position and whether the official failed to disclose a material conflict. See Blumeyer, 114 F.3d at 766 (upholding the

---

[9]Before Congress passed § 1346, several circuit courts, including this court, had read § 1341 to include honest services fraud. See United States v. States, 488 F.2d 761, 764 (8th Cir. 1973) (holding that § 1341 was not limited to frauds concerning money or property). The Supreme Court, in McNally v.United States, 483 U.S. 350 (1987), disagreed, overruling States and several other honest services fraud cases. The following year, Congress responded to McNally, passing § 1346, which specifically extends the mail fraud statute to include "the intangible right of honest services." Section § 1346 revived the precedential value of all Eighth Circuit cases decided pre-McNally. See United States v. Blumeyer, 114 F.3d 758, 765 (8th Cir. 1997).

-18-

defendant's conviction pursuant to §§ 1341 and 1346 and concluding that the representative's "position as a state legislator involved significant discretion, and the jury reasonably could have concluded that the defendants schemed to deprive Missourians of [the representative's] honest services by appropriating his discretion for the benefit of [defendant's company], a company in which [the defendant] concealed his interest"); United States v. Rabbitt, 583 F.2d 1014, 1025-26 (8th Cir. 1978) (noting that in honest services mail fraud convictions "the conduct deemed fraudulent deprived the public either of some potential tangible gain . . . , or of its right to honest and fair dealing in the conduct of the officer in question, or of its right to disclosure of the officer's interest in the transaction at issue"); United States v. McNeive, 536 F.2d 1245, 1251 (8th Cir. 1976) ("It is only when [a public official's] failure to provide honest and faithful services is combined with his material misrepresentations [to his employer] and his active concealment that an illegal fraud occurs which is cognizable under § 1341.").

The issue here is where the duty to disclose a material interest originates. Jennings urges us to adopt the Third Circuit's approach, and to limit the scope of § 1346 by requiring a link between the mail fraud prosecution of local officials and their violation of state disclosure laws. See United States v. Panarella, 277 F.3d 678, 692-93 (3d Cir. 2002) (holding that "state law offers a better limiting principle for purposes of determining when an official's failure to disclose a conflict of interest amounts to honest services fraud");[10] see also United States v. Murphy, 323 F.3d 102, 104 (3d Cir. 2003) (stating that, in addition to a violation of a state disclosure statute, there must also be a fiduciary relationship in order to prosecute local public officials for honest services mail fraud).

---

[10]The court did not decide "whether a violation of state law is always necessary for nondisclosure to amount to honest services fraud." Panarella, 277 F.3d at 693.

-19-

In contrast, the government encourages us to adopt the First Circuit's test, which the district court seemed to follow in crafting Jennings's jury instructions. The First Circuit has taken a broader approach than the Third Circuit. According to the First Circuit, the duty to disclose a potential conflict can come not only from specific state disclosure laws, but also from "the legislator's general fiduciary duty to the public." United States v. Woodward, 149 F.3d 46, 62 (1st Cir. 1998) (quotation omitted). "A public official has an affirmative duty to disclose material information to the public employer." Id.

We need not adopt either party's suggestion, however, because both parties agree that if the government was able to prove Jennings violated either Minn. Stat. §§ 10A.07 or 10A.09, Jennings's sufficiency argument fails. Under both the Third and First Circuit's tests, a violation of a state disclosure statute is evidence of a public official's intent to defraud the state's citizens of their right to his honest services. Thus, because we hold that the government presented evidence sufficient to prove that Jennings violated Minn. Stat. § 10A.07, we save our discussion of the limits of § 1346 for a future case.

At trial, the government called several witnesses who discussed legislative reporting requirements in Minnesota. Steve Sviggum, the Speaker of the Minnesota House of Representatives, testified that disclosures of possible conflicts of interest are governed by Minn. Stat. § 10A and a Minnesota House rule. Under § 10A, public officials are required to disclose any particular interest the public official has with respect to any issue before the body in which the official serves. Minn. Stat. § 10A.07. Specifically, the statute requires the following:

> Disclosure of potential conflicts. A public official . . . who in the discharge of official duties would be required to take an action or make a decision that would substantially affect the official's financial interests or those of an associated business, unless the effect on the official is no greater than

on other members of the official's business classification, profession, or occupation, must [deliver a written statement describing the potential conflict to the presiding officer].

Minn. Stat. § 10A.07(1).

Thus, Minnesota law requires the public official to notify the presiding officer—in this case the Speaker of the House—of a particular financial interest to the public official or his associated business arising out of a matter within the direct scope of his duties or subject to his discretion. An associated business is defined as one in which the individual receives more than $50 of compensation in any month or in which the individual is a holder of securities worth more than $2500. Minn. Stat. § 10A.01 subdiv. 5. The statute does not require notice when a legislator's interest in proposed legislation is the same as others in the same general vocation, such as teachers or farmers. The Speaker testified that disclosure is required if legislation affects a legislator's particular interests or those of a legislator and a few others. According to the Speaker, representatives are very sensitive to issues of conflict of interest, and, in addition to the state statute, there is a separate House rule requiring disclosure of conflicts of interest.

The Speaker testified that Jennings never gave any notice of a conflict of interest in regards to the proposed legislation expanding the scope of the CIP. When the Chairman of the Regulated Industries Committee received a complaint that Northern Pole was benefitting unfairly from the CIP legislation and inquired with Jennings, Jennings advised him that Northern Pole was simply a constituent in his district. Jennings never disclosed he had any financial interest in Northern Pole. Both the Speaker and the Chairman of the Regulated Industries Committee testified that knowing a legislator had made loans to a company that would be affected by legislation would have been significant in their consideration of that legislator's support for the bill and important for the public to know, as well.

To counter this evidence, Jennings offered the testimony of Jeanne Olson, the Executive Director of the Campaign Finance and Public Disclosure Board ("the Board"). The Board is responsible for administering the provisions of Minn. Stat. §10A. The Board answers specific questions about § 10A, and issues fact-specific advisory opinions. Olson testified that, in her view, the conflict portion of the statute, § 10A.07, is narrow; in this case, it only applies if the legislator *would* benefit from voting on the particular bill, not if he legislator potentially *could* benefit. Jennings also introduced an advisory opinion from the Board that was prepared with regard to a separate matter. The opinion stated that if a party has an interest in a vendor that is one of a group of vendors that could benefit from a particular bill, there is no conflict.

As to the issue of whether Jennings was exempt from reporting requirements because Northern Pole was one of a group of businesses that would benefit from the bill, we find that the specific facts of this case would allow a reasonable jury to find that the effect of the bill was greater upon Northern Pole. Northern Pole was the only company that initially received CIP funds from the legislation Jennings championed. In fact, Jennings indicated that he was unaware of other companies providing the same services as Northern Pole. There was sufficient evidence showing that the CIP legislation affected Jennings's particular interest, and was not intended to benefit an entire industry. Evidence at trial showed that Jennings drafted and introduced legislation specifically to affect the research and development services that Northern Pole began providing.[11]

In addition, we agree with Olson's testimony in that the statute requires a conflict that "*would* substantially affect the official's financial interests or those of an

---

[11]The government also argues that Minn. Stat. 10A.09, which requires that each public official must file a statement of economic interest with the board within sixty days of accepting employment, was also violated in this case. Because we find the evidence of a violation of Minn. Stat. § 10A.07 to be more than sufficient, we decline to address this issue.

-22-

associated business." We find, however, that the legislation did affect, and obviously would have affected Northern Pole, and thus, would have directly affected Jennings because he personally guaranteed M&M and C&J Properties' loans to Northern Pole. The legislation was tailored to provide Northern Pole with a new potential source of funding, for which it was qualified to receive. In fact, the new source of funding was Northern Pole's only source of funding other than the financial support it had received from M&M and C&J Properties.

Because a reasonable jury could find that Jennings violated a statutory duty to disclose his financial interest in Northern Pole under state law, we conclude that Jennings's sufficiency argument is without merit.

B.      Jury Instructions

Jennings next challenges Jury Instruction No. 9B. The district court has wide discretion in crafting jury instructions. We will affirm if the instructions, taken as a whole, fairly and adequately instruct the jurors on the law applicable to the case. United States v. Katz, 445 F.3d 1023, 1030 (8th Cir. 2006). The instructions "do not need to be technically perfect or even a model of clarity." Id. (quotation omitted).

Jennings argues that the jury should have been instructed that if the government failed to prove Jennings violated the disclosure standards in the statute, then he acted in good faith and lacked the requisite fraudulent intent. This argument fails for the reasons discussed above. Compliance with a state disclosure statute does not necessarily prove the lack of intent to defraud. Non-compliance with a state statute is, however, strong evidence of Jennings's intent to deprive the citizens of his honest services, and thus evidence that a scheme to defraud existed. The district court properly instructed the jury to look at Minnesota's disclosure rules in its determination of what constitutes material financial information. The court's instructions correctly

-23-

stated that the compliance or non-compliance with these rules is only evidence relating to Jennings's intent to defraud.

Instruction No. 9B begins with the statement: "A public official has a duty to disclose material financial information to the public employer." Jennings argues that this statement is too broad and asks us to reject the idea that there is a general, federal common law duty for public officials to disclose conflicts. Jennings is correct in arguing that the government must first prove that there is a duty to disclose the information and then that there was a violation of that duty. Taken in isolation, the first sentence of Instruction No. 9B is arguably over-broad. However, when taken as a whole, Instruction No. 9B adequately instructed the jury on the applicable law. Instruction No. 9B properly instructed the jury to "consider the standards and rules set by a person's employer, in this case the Minnesota House of Representatives" when determining what "constitutes material financial information." As discussed above, both parties agree Minn. Stat. § 10A.07 places a duty on legislators to disclose material conflicts of interest. Thus, as a matter of law, Jennings was subject to a duty to disclose any material conflicts he had, and the only issue for the jury in this case regarding the duty to disclose was whether Jennings violated that duty. The district court did not abuse its discretion in instructing the jury.

Jennings also argues that the court erred in instructing the jury regarding loss or gain. The court instructed the jury: "When an official fails to disclose a material financial interest in a matter over which he has decision-making power, the public is deprived of the intangible right to the official's honest services, *whether or not a tangible loss to the public is shown*." "It is well-settled in this circuit that, to prove a scheme to defraud, the government need not prove actual harm." Lamoreaux, 422 F.3d at 754. Jennings's argument that the court erred in its instruction on loss or gain fails.

C. Evidentiary Issues

Jennings next argues that the district court erred in two evidentiary rulings at trial. Specifically, Jennings argues that the district court erred by: (1) allowing former Commerce Commissioner James Bernstein to answer a hypothetical question that Jennings claims assumed Jennings's guilt, and (2) admitting a handwritten note by George Vitalis into evidence. We review the district court's evidentiary rulings for clear abuse of discretion. United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006).

1. Bernstein Testimony

At trial, Commerce Commissioner Bernstein was asked whether he would have approved NSP's CIP budget had he known of Jennings's financial interest in the proposal. Over an objection by Jennings, who claimed that the question was hypothetical, Bernstein was allowed to answer the question. Bernstein testified that he never would have approved the NSP grant to Northern Pole had he known that Jennings had financial interest in the proposal.[12]

_____

[12]The pertinent part of Bernstein's testimony is as follows:

> Prosecutor: Did Representative Jennings ever indicate to you that he had a financial interest [in NSP's CIP proposal]?
> Mr. Bernstein: He never did.
> Prosecutor: Would that have affected your analysis of the CIP proposal?
> Defense Attorney: Objection, Your Honor.
> The Court: Overruled. You may answer.
> Defense Attorney: This is my objection from yesterday, your Honor, hypothetical.
> The Court: I know.
> . . .

The district court had previously ruled that the government could not ask witnesses whether their conduct would have been different had they known that a legislator had loaned money to a company that would be an affected party. The court stipulated, however, that the government could ask questions that did not specifically ask about Jennings's particular financial interest, but instead inquired in broad terms about how a financial interest would affect a decision maker's conduct.

Jennings now argues that the court allowed Bernstein to answer a guilt-assuming hypothetical question. Such questions, Jennings contends, are "grossly prejudicial" and strike "at the very heart of the presumption of innocence." United States v. Polsinelli, 649 F.2d 793, 796 (10th Cir. 1981). Polsinelli and the other cases Jennings cites in his brief can be distinguished from this case, however. In those cases, witnesses were asked hypothetical questions in the context of character testimony. In each case, character witnesses for the defense testified as to the general reputation or opinion of the defendant in the community. Then, during cross-examination, the government asked the witnesses whether their opinion of the defendant would change if they had known the defendant had committed the crime for which he was being tried. See United States v. Pirani, 406 F.3d 543, 554 (8th Cir. 2005) (holding that it was improper for the prosecutor "to ask . . . guilt-assuming questions" of the defendant's character witness, "particularly one which assumed [the defendant] was guilty of the charged offenses," but that this did not constitute plain error); United States v. Barta, 888 F.2d 1220, 1224-25 (8th Cir. 1989) (finding harmless error where the prosecutor asked the defendant's character witnesses

---

Prosecutor: Would that kind of information have affected
your analysis?
Mr. Bernstein: Absolutely.
Prosecutor: How would it have affected your analysis?
Mr. Bernstein: We would have rejected the proposal. You
can't do a CIP proposal to someone who's got a vested
interest in it. You can't do it.

whether their "opinion of [the defendant's] reputation would change if . . . the facts showed that he had, in fact," committed the offense for which he was being tried); Polsinelli, 649 F.2d at 795 (finding reversible error where the prosecutor was permitted to ask the defendant's character witnesses questions that "were so framed as to assume that [the defendant] was, in fact, guilty of the offense for which he was then on trial"); United States v. Candelaria-Gonzalez, 547 F.2d 291, 293-94 (5th Cir. 1977) (holding that the witness's answers to the prosecutor's questions about the defendant's character on cross-examination "sought speculative responses resting upon an assumption of guilt," and that such error under the circumstances "required reversal").

In contrast, Bernstein was not called by the defendant as a character witness. Bernstein was called by the government, and his testimony was offered to prove the issue of the materiality of Jennings's undisclosed interest—an issue the government was required to prove under the mail fraud statute. See 18 U.S.C. §§ 1341 and 1346. Further, while the question posed to Bernstein was a hypothetical, the phrasing of the government's question does not assume that Jennings is guilty of the crime for which he was being tried. Pursuant to the district court's previous ruling, the government asked Bernstein a hypothetical question regarding how a legislator's "financial interest" would affect Bernstein's decision making. The government's question did not allude to the specific interest or assume wrongdoing on Jennings's part; Jennings acknowledges that he did not disclose his financial interest. The government asked the question to establish the materiality of the information.

The government was required to prove whether Jennings's financial interest in Northern Pole was material by showing that it would have had "a natural tendency to influence, or [was] capable of influencing the government agency or official." United States v. Mitchell, 388 F.3d 1139, 1143 (8th Cir. 2004). The government would be hard pressed to prove this element without asking whether the undisclosed information would have affected the decision maker's analysis. See United States v.

-27-

Bistrup, 449 F.3d 873, 881 (8th Cir. 2006) (considering the testimony of bank representatives that the disclosure of withheld information would have affected lending decisions in finding sufficient evidence of material misrepresentation). The district court did not err in allowing Bernstein's testimony.

### 2.     Vitalis Note

Jennings next argues that the district court erred by admitting into evidence a note written by George Vitalis. The note was found in Vitalis's business records. Vitalis passed away before Jennings's trial, and the note was introduced through the testimony of Jessica Vitalis, George Vitalis's daughter-in-law.

In the note Vitalis memorialized payment instructions "per phone Loren Jennings." The note was dated July 24, 2000—the same day NSP made a $100,000 payment of CIP funds to Northern Pole. Included in the handwritten payment instructions was the instruction to write a $10,804 check to the FDIC on behalf of C&J Properties. Telephone records confirm contact between Jennings, Vitalis, and representatives of NSP referred to in the handwritten note.

Jennings objected to the introduction of the handwritten note on hearsay and Confrontation Clause grounds. Complying with procedures set forth in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978), the district court conditionally admitted the note subject to later proof linking the statement to a conspiracy between Vitalis and Jennings. On the final day of the government's evidence, before the note was admitted into evidence, the court made its final ruling on Jennings's objection, and admitted the note as evidence against Jennings, finding that it was not hearsay because it constitute a co-conspirator statement, Fed. R. Evid. 801(d)(2)(E), and that any of Jennings's or Vitalis's statements contained within the note did not pose Confrontation Clause problems. Jennings has abandoned his Confrontation Clause argument; he appeals only the court's hearsay ruling.

Pursuant to Federal Rule of Evidence 801(d)(2)(E), "a statement is not hearsay if it was made by a party's coconspirator during the course and in furtherance of the conspiracy." United States v. Mahasin, 362 F.3d 1071, 1084 (8th Cir. 2004). The government bears the burden of proving by a preponderance of the evidence that "(1) a conspiracy existed, (2) both the declarant and [the co-conspirator] were members of the conspiracy, and (3) the declarant made the statement in the course and in furtherance of the conspiracy." Id.

At the time the court made its ruling, there was ample evidence supporting the admission of the handwritten note. For example, John James testified regarding a meeting in 1999 between Jennings, James, and Vitalis in which James and Jennings explained to Vitalis how they were going to utilize Northern Pole to obtain CIP funds to pay the M&M and C&J Properties loans. At this meeting, James testified, they asked Vitalis to be the face of Northern Pole. Telephone records and payments by Vitalis to Jennings provide circumstantial evidence of the existence of an agreement and understanding between Vitalis and Jennings to use CIP funds to pay down the loans to Northern Pole. The district court did not abuse its discretion in admitting the handwritten note.

### D. Forfeiture Issues

Jennings next argues that the district court erred in ordering Jennings to forfeit the scheme proceeds that benefitted him personally. The superseding indictment included forfeiture allegations. It called for the forfeiture of Jennings's proceeds from the mail fraud counts, based on 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the money laundering count, based on 18 U.S.C. § 982(a)(1). "[S]atisfied that forfeiture [was] appropriate here," the district court ordered Jennings to forfeit $284,398, specifically acknowledging that the total included proceeds from the mail fraud counts as well as the money laundering count.

Jennings first contends that the forfeiture statutes only authorize forfeiture of the money laundering proceeds, not the mail fraud proceeds. Next, Jennings claims that even if the forfeiture statutes include the mail fraud proceeds, ex post facto considerations preclude the inclusion of some of the funds ordered forfeited. Finally, Jennings argues that the government's attempt to forfeit substitute assets is barred by the one-year statute of limitations governing forfeiture actions. As Jennings's forfeiture arguments are questions of law, we review each de novo.

### 1.  Authorized by Law

Jennings first argues that 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) do not authorize the forfeiture of proceeds from the mail fraud counts. Jennings contends forfeiture is not available on anything but the money laundering count, making any amount over $25,000[13] not supported by the law.

Prior to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. 106-185, § 16, 114 Stat. 202, 221, criminal forfeiture was set forth only in 18 U.S.C. § 982. Section 982 included authority for criminal forfeiture in mail fraud cases only in instances in which the mail fraud affected a financial institution. 18 U.S.C. § 982(a)(2)(A) (1994). After the amendment, 28 U.S.C. § 2461(c), which became effective on August 23, 2000, read:

> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information in accordance with

---

[13]Because the jury acquitted Jennings on the conspiracy and other money laundering counts, the government concedes that only the $25,000 involved in Count 7 of the superseding indictment is subject to criminal forfeiture under 18 U.S.C. § 982.

the Federal Rules of Criminal Procedure, and upon conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act (21 U.S.C. § 853), other than subsection (d) of that section.

28 U.S.C. 2461(c) (2000).

Criminal forfeiture for mail fraud proceeds "is specifically authorized when special circumstances are present, such as when the mail fraud affects a financial institution." United States v. Vampire Nation, 451 F.3d 189, 198 (3d Cir. 2006) (citing 18 U.S.C. § 982(a)[14]). Jennings's mail fraud did not involve a financial institution; therefore, the government "seeks criminal forfeiture for [the defendant's] mail fraud proceeds under 28 U.S.C. § 2461(c) through the civil forfeiture provision, 18 U.S.C. § 981(a)(1)(C), which does not require any special circumstances as a prerequisite to forfeiture for mail fraud crimes." Vampire Nation, 451 F.3d at 199 (footnote omitted). Jennings argues that 28 U.S.C. 2461(c) does not authorize such a forfeiture because 18 U.S.C. § 982(a)(2)(A) provides for criminal forfeiture only in specific circumstances of mail fraud and no such circumstances are present here.

---

[14]In relevant part, 18 U.S.C. § 982 (2006) states:

> § 982. Criminal forfeiture
> (a)(1) The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.
> (2) The court, in imposing a sentence on a person convicted of a violation of, or a conspiracy to violate-
> (A) section . . . 1341 [mail fraud] . . . of this title, affecting a financial institution . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

Several circuits have recently analyzed this statutory scheme and have come to the conclusion that Congress intended § 2461(c) to apply in this situation. See Vampire Nation, 451 F.3d at 200 (stating that § 2461(c) permits "criminal forfeiture of proceeds from general mail fraud because a statutory provision—18 U.S.C. § 981(a)(2)(C)—permits civil forfeiture of such proceeds and no criminal forfeiture provision applies to general mail fraud"); United States v. Edelkind, 467 F.3d 791, 799 (1st Cir. 2006) (stating that Congress intended the 2000 version of § 2461(c) to 'fill[] the gap between criminal and civil forfeiture by making criminal forfeiture available in every criminal case that the criminal forfeiture statute does not reach but for which civil forfeiture is legally authorized"); see also United States v. Razmilovic, 419 F.3d 134, 136 (2d Cir. 2005) ("Section 2461(c) thus authorizes criminal forfeiture as a punishment for any act for which civil forfeiture is authorized . . . .").

Section 981(a)(1)(C) permits the government to seek civil forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)." 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7)(A) includes mail fraud within the definition of "specified unlawful activity." See 18 U.S.C. § 1956(c)(7) (incorporating by reference the RICO predicate offenses in 18 U.S.C. § 1961(1), which include mail fraud). When it enacted § 2461(c), Congress "made clear . . . that it hoped to encourage the use of criminal forfeiture procedures . . . 'whenever any form of forfeiture is otherwise authorized by statute.'" Edelkind, 467 F.3d at 799 (quoting H.R. Rep. 105-358(I), 1997 WL 677201, at *35-36 (1997)). Considering the language of § 2461(c), the legislative history surrounding the 2000 amendment, and Congress's 2006 amendment to the statute, which "resolves doubts for the future in the government's favor,"[15] id. at 800, we join these other circuits in

<hr/>

[15]On March 9, 2006, section 2461(c) was amended to read:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture

holding that § 2461(c) allows for criminal forfeiture of the proceeds of general mail fraud.[16]

### 2.    Ex Post Facto Clause

Finding that the district court had the legal authority to order forfeiture of Jennings's mail fraud proceeds, we next address Jennings's alternative, ex post facto argument.  Jennings argues that the "vast majority of the $284,398 sum awarded by the court involves payments made prior to August 23, 2000."  According to Jennings, because CAFRA did not become effective until August 23, 2000, the forfeiture award cannot include the proceeds of mail fraud violations that occurred before that date.

---

of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code.  The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title VI, § 410.

[16]We note that United States v. Croce, 345 F. Supp. 2d 492, 496 (E.D. Pa. 2004), on which Jennings relies heavily, was repudiated by the Third Circuit in Vampire Nation, 451 F.3d at 200 ("In sum, we reject *Croce II* and read the plain language of 28 U.S.C. § 2461(c) as permitting criminal forfeiture of proceeds from general mail fraud . . . ."), and later reversed in United States v. Croce, 209 Fed. Appx. 208 (3d Cir. 2006) (unpublished).

"In the case of continuing offenses . . . the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute." United States v. Garfinkel, 29 F.3d 1253, 1259 (8th Cir. 1994) (internal quotations and alterations omitted). Therefore, if the evidence supports the government's allegations that the scheme continued past the effective date of the statute, the application of § 2461(c) to Jennings's conviction would not violate the Ex Post Facto Clause. See id. at 1260.

The superseding indictment alleged that Jennings's scheme to deprive the State of Minnesota of his honest services lasted "[f]rom in or about 1997, and continuing through in or about 2002." Section 2461(c) became effective on August 23, 2000. There was ample evidence at trial proving that the mail fraud scheme lasted beyond August 23, 2000: NSP made two payments of CIP funds to Northern Pole, and George Vitalis wrote one check to the FDIC and two checks to the Lake Area Bank after this date. Phone records and checks themselves support the government's allegations that Jennings's scheme continued beyond August 23, 2000. The district court's forfeiture order did not violate the Ex Post Facto Clause.

### 3.    Statute of Limitations

Further, Jennings's statute-of-limitations argument is misplaced. 18 U.S.C. § 984(b) sets forth a one-year statute of limitations for actions "pursuant to this section." 18 U.S.C. § 984(b). Section 984 provides for in rem proceedings against fungible property in civil forfeiture actions when the government cannot specifically identify the proceeds directly traceable to the offense and instead must resort to substitute assets. 18 U.S.C. § 984(a); see United States v. $8,221,877.16, 330 F.3d 141, 158 (3d Cir. 2003) ("Section 984 is a 'substitute asset provision' enacted to overcome . . . tracing difficulties and ease the government's burden of proof in civil forfeiture proceedings involving fungible property.") The government's forfeiture claim is not a civil forfeiture claim; as such, § 984(b) has no application to the criminal forfeiture

ordered against Jennings *in personam* pursuant to 28 U.S.C. §2461(c). The government's forfeiture claim does not implicate, or rely on, 18 U.S.C. § 984.

For all of the foregoing reasons, the district court did not err in ordering Jennings to forfeit $284,398.

E.      Sentencing Issue

Finally, Jennings argues that the district court erred in its calculation of his advisory Guidelines range. Jennings contends that the district court should have applied U.S.S.G. § 2C1.3, "Conflict of Interest; Payment or Receipt of Unauthorized Compensation," rather than § 2C1.7, "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions." Under § 2C1.7, Jennings was subject to an advisory Guidelines range of forty-six to fifty-seven months in prison. If the court had applied § 2C1.3 instead, the applicable advisory Guidelines range would have called for substantially less prison time. We review the district court's interpretation and application of the advisory Guidelines de novo. United States v. Rouillard, 474 F.3d 551, 555 (8th Cir. 2007).

The statutory index to the 2001 Guidelines lists §§ 2B1.1 and 2C1.7 as the applicable guidelines sections for a violation of 18 U.S.C. § 1341. Section 2B1.1 covers offenses involving larceny, embezzlement, and other forms of theft, while § 2C1.7 specifically applies to "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions." When sentencing a defendant in cases such as this where more than one guideline section may apply, a district court is instructed to "determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2, comment. (n.1) (2001).

-35-

The application notes to § 2C1.7 state that "[t]his guideline applies only to offenses committed by public officials or others acting with them that involve (A) depriving others of the intangible right to honest services (such offenses may be prosecuted under 18 U.S.C. §§ 1341-1343) . . . ." U.S.S.G. § 2C1.7, comment. (n. 1). Section 2C1.7 also states that "[i]f the offense is covered more specifically under . . . §2C1.3 (Conflict of Interest), apply the offense guideline that most specifically covers the offense." U.S.S.G. § 2C1.7(c)(4). Therefore, the question is whether Jennings's offense conduct "falls within the range of conduct Congress intended 18 U.S.C. §§ 1341, 1346 to encompass and, concomitantly, rests squarely within the heartland of section 2C1.7," United States v. Grandmaison, 77 F.3d 555, 567 (1st Cir. 1996), or, whether his conduct falls more specifically within the conflict of interest guideline, § 2C1.3.

In making his argument for the application of § 2C1.3, Jennings relies on United States v. Hasner, 340 F.3d 1261 (11th Cir. 2003). Hasner was the chairman of the Palm Beach County Housing Finance Authority ("HFA"), as well as the proprietor of a realty company. Id. at 1265. In September 1996, Hasner proposed the HFA hire Lisa Fisher as a consultant, and the board approved a motion to negotiate a contract. Id. The contract was negotiated by the HFA attorney and presented to the board in October 1996, although it was not approved at the meeting. Id. In the interim, Fisher contacted Hasner regarding potential sites for low-income housing projects for another client. Hasner directed Fisher to a realty company, and the contact resulted in the purchase of a parcel of land for the project. Id.

On November 14, 1996, the day Fisher orally agreed to purchase the land, Fisher also agreed to pay Hasner a referral fee. Id. Four days later, at the HFA meeting, Fisher's consulting agreement was brought before the board and approved unanimously by the HFA members, including Hasner. Id. Although Fisher's involvement in the upcoming housing project was disclosed to the board, the referral fee to Hasner was not. Id. In December 1996, when Fisher's group sought HFA

financing for the housing project, Hasner recused himself from voting and executed a potential conflict form, without disclosing the nature of the conflict.  Id. at 1266. Fisher and Hasner never disclosed the arrangement to pay Hasner a referral fee and later engaged in a transaction designed to conceal it.  Id. at 1267. The Eleventh Circuit held, based on those facts, that the "offenses at issue essentially involve[d] Hasner's failure to disclose his conflicts of interest, the district court did not clearly err by applying section 2C1.3 to Fisher and Hasner's offenses."  Id.

The government argues, and we agree, that Jennings's conduct is more like the conduct at issue in Grandmaison than the conduct in Hasner.  In addition to not disclosing a conflict of interest, Grandmaison and Jennings both used their positions of power to lobby for their personal interest and to influence their colleagues. Grandmaison involved a city alderman who abused his office and was convicted under 18 U.S.C. §§ 1341 and 1346.  Like others, Grandmaison held a full time job in addition to his duties as an alderman; he was the director of a construction company. Grandmaison, 77 F.3d at 557-58.  When his construction company submitted a bid on a contract to the Board of Aldermen, Grandmaison recused himself publically.  Id. at 558.  Behind the scenes, however, he lobbied colleagues and provided them with gratuities on behalf of his employer, resulting in the award of the bid to Grandmaison's employer.  Id.

Grandmaison pleaded guilty, but argued, as Jennings does, that his conduct fell outside the heartland of § 2C1.7 and within the scope of § 2C1.3.  Id. at 565.  Faced with these facts, the First Circuit held that because Grandmaison's conduct fell "within the range of conduct Congress intended 18 U.S.C. 1341, 1346 to encompass," the district court did not err in sentencing the defendant pursuant to § 2C1.7.  Id. at 567.  According to the court, just because Grandmaison's conduct involved the non-disclosure of a conflict of interest, "[i]t does not follow from this . . . that he should not be sentenced pursuant to section 2C1.7, the guideline corresponding to the mail fraud statute."  Id.

As the district court stated at the sentencing hearing, while Jennings's non-disclosure of his conflict of interest was important evidence of his scheme to defraud the citizens of Minnesota and there "is no question conflicts of interest [were] talked about during the course of the trial," it was not the only criminal conduct proven by the government at trial. Like in Grandmaison, the government also charged and proved that Jennings used his position to influence his colleagues and members of the utility industry for personal gain, and that he lied and fabricated documents. There was more to his scheme than a conflict of interest. The district court did not err in sentencing Jennings under § 2C1.7.

III.    Conclusion

For the foregoing reasons we affirm the judgment of the district court.

_____